**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Raymond POWELL, Appellee.**

**Commonwealth of Pennsylvania, Appellant**

v.

**Clayton J. Solomon, Appellee.**

Superior Court of Pennsylvania.

Argued Feb. 23, 2010.
Filed March 31, 2010.

Michelle H. Sibert, Assistant District Attorney, for Commonwealth, appellant.

Timothy L. Clawges, Public Defender, for Powell, appellee.

Royce L. Morris, Harrisburg, for Solomon, appellee.

BEFORE: GANTMAN, ALLEN, and LAZARUS, JJ.

OPINION BY ALLEN J.:

¶ 1 In this appeal, the Commonwealth asserts that the trial court erred in granting Appellees' motion to suppress physical evidence.[1] We affirm in part, reverse in part, and remand.

■ ¶ 2 Following a preliminary hearing, Appellees were held for court on drug and conspiracy charges. Prior to trial, they filed suppression motions. At the suppression hearing, held April 3, 2009, the Commonwealth called Corporal Gregory J. Miller of the Pennsylvania State Police. Although Appellees did not call any witnesses, the audio/visual recording of the traffic stop was played for the court. The suppression court summarized Corporal Miller's testimony as follows:[2]

> [Corporal Miller] does illegal drug interdiction work and supervises such activities. He testified that part of those activities is learning "how to extend a traffic stop." On the afternoon of October 9, 2008, Miller was in a uniform

---

1. Along with its notice of appeal, the Commonwealth has certified in good faith that the court's order granting suppression of the evidence will terminate or substantially handicap its prosecution of the case. *See Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382, 386 (1985); *see also* Pa.R.A.P. 311(d), 904(e).

2. Although the suppression court did not issue formal findings of fact, we need not remand; "[w]hen the suppression court's specific factual findings are unannounced or there is a gap in the findings, the appellate court should consider only the evidence of the prevailing suppression party ... and the evidence of the other party ... that, when read in the context of the entire record, remains uncontradicted." *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680, 685 (2005).

working on the Pennsylvania Turnpike in Cumberland County. While driving an unmarked police car, he saw a Honda car with a New York license plate traveling westbound with "large objects hanging from the rearview mirror." Miller stopped the car for a violation of Section 4524(c) of the Vehicle Code. Miller walked up to the Honda at 14:03:36. Clayton Solomon was the driver and Raymond Powell was a passenger in the front seat. While standing at an open window on the passenger side, Miller said why he had stopped the car. There was a "Bob Marley" bandana and a Christmas tree air freshener hanging from the rearview mirror. Marley [was] a Reggae singer and there were depictions of marijuana leaves on the bandana. Miller said "Take that off—I'm going to give you a warning for it not a ticket." Solomon provided Miller with his New York driver's license and a registration for the Honda. The vehicle was registered to Beverly C. Johnson at P.O. Box 31697, Rochester, New York. Solomon said she was his wife. He said he and Powell were driving from Queens, New York to Pittsburgh. At 14:04:25 Miller left the passenger door, walked to the rear of the car and talked to a uniformed state trooper who had arrived in a marked patrol car. At 14:04:49, Miller walked back to the passenger side of the car and asked Powell for identification. He told Powell that he is required by regulation to "write down everyone who is in the car." Powell said that he did not have a license and he gave [Miller] his Jamaican electoral ID card. Miller told the [car's] occupants to turn their cell phones off. He said "You can talk to anyone you want once you get your warning and you are out of here." During the interaction up to this point, Solomon gave short responses and Powell did not make eye contact with Miller.

Miller returned to his police car at 14:05:44 and conducted a radio check. At times he saw Solomon looking at him in the rearview mirror. The radio check showed that there were no warrants outstanding for Solomon and Powell. Solomon's driver's license and the vehicle registration were in order. At 14:23:10 Miller returned to the Honda after telling his radio contact that he was "going to ask some questions and see what happens." He gave Solomon back his license and registration and he gave Powell back his "stuff." He asked Solomon to get out [of the car] so that he could explain the warning to him. Solomon got out and he and Miller went to the rear of the Honda. Miller said: "I need you to sign here—I'll give you a copy of that and you're free to go." Solomon signed the warning and Miller gave him a copy. At 14:24:14. Miller said: "Here's your copy—have a safe trip alright." Miller made about a three-quarter turn toward his patrol car. At 14:24:18 he turned back towards Solomon and said "Sir, is it alright if I talk to you for a minute." Solomon made no response. Miller asked the same question again. Solomon said "No problem." Miller asked Solomon where they were coming from and he said "From Queens," and that they were headed to Pittsburgh. Miller asked Solomon "Who lives out there?" Solomon said "Brittany," and that Brittany was his girlfriend. Solomon told Miller that while in Pittsburgh he was going to pick up some shoes. Miller asked him where were they staying in Pittsburgh "A hotel or something," to which Solomon said: "No we are staying at her house." Miller asked who Powell is and Solomon said "A friend." Miller told Solomon "I am going to talk to him [referring to

Powell] for one minute. Hang loose here." At 14:25:30 Miller went to the passenger side window of the Honda. He told Powell that he gave Solomon a warning with no fine and no points. He said "Do you mind if I talk to you a couple of minutes." Powell answered some of the same questions Miller had asked Solomon although he added that Brittany was sick and that they were going to come back from Pittsburgh right away. At 14:26:27, Miller walked back and talked again to Solomon. He asked him if he had any guns, cocaine, marijuana or any large amounts of money he could not account for. Solomon said "no" to each item. By this time a second uniformed state trooper who had arrived in another marked patrol car was present. [Miller had not called for assistance; both troopers' arrival was unexplained.] At 14:26:44, Miller said "Do you have a problem with me searching the car." Solomon grunted something that cannot be deciphered on the audiotape. He gestured toward the car and Miller immediately asked again: "Is it okay to search it?" At 14:26:47 Solomon made no response and again gestured toward his car. [On direct examination Miller testified that when he asked Solomon if he had a problem with him searching the car, Solomon said "nah," and motioned toward his car. On cross-examination he testified that he wrote in his police report that Solomon said "Yeah or something to that effect." What the recording shows is that Miller asked Solomon a second time: "Okay to search it," to which no response can be heard. Solomon again made a small gesture with his right hand toward the Honda and walked towards the passenger door. Miller never testified that he asked Solomon a second time for consent to search the car.] Miller said "Hang loose." Solomon walked toward

the driver's door and the other trooper said "Come here a minute." Solomon arrived at the driver's door and the other trooper walked up to him and directed him away from the door. Miller said: "Come over here a second." The trooper and Miller walked back to the rear of the car where Miller asked Solomon if he had any weapons and told him he is going to pat him down. The third trooper was at the rear of the Honda. Miller had Powell get out of the car. Miller told both Powell and Solomon that they were not under arrest. They were patted down. A search of the Honda was conducted which resulted in the seizure of contraband.

Suppression Court Opinion, 5/1/09, at 3–7 (footnotes omitted).

¶ 3 After hearing Corporal Miller's testimony, the suppression court took the matter under advisement. By order entered May 1, 2009, the suppression court granted Appellees' suppression motion. According to the suppression court, although the initial traffic stop for the rearview mirror obstruction was proper, Solomon did not give Corporal Miller consent to search the vehicle. On this basis alone, the court ruled that all of the physical evidence seized was subject to suppression. The court further found, however, that even if Solomon had given the proper consent, the evidence would still have to be suppressed because the prolonged detention following the initial stop was unlawful, and there was not a sufficient cessation between the conclusion of the traffic stop and Corporal Miller's renewed interaction with Solomon under the dictates of *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884 (2000) and *Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903 (2000). This appeal followed. The suppression court did not require Pa.R.A.P. 1925 compliance.

¶ 4 The Commonwealth raises the following issues on appeal:

I. DID THE [SUPPRESSION] COURT ERR IN CONCLUDING THAT THE INITIAL DETENTION WAS UNLAWFUL BASED ON THE DURATION OF THE TRAFFIC STOP, WHERE THE ENTIRE TRAFFIC STOP TOOK APPROXIMATELY 23 MINUTES?

II. DID THE [SUPPRESSION] COURT ERR IN FINDING THERE WAS NO SUFFICIENT BREAK IN THE CAUSAL CHAIN BETWEEN THE PRIOR UNLAWFUL DETENTION AND CONSENT TO SEARCH?

III. WERE [APPELLEES] SUBJECT TO A CONTINUED INVESTIGATIVE DETENTION BASED ON REASONABLE AND ARTICULABLE SUSPICION THAT CRIMINAL ACTIVITY WAS AFOOT?

IV. DID THE [SUPPRESSION] COURT ERR WHEN IT FOUND THAT [SOLOMON'S] CONSENT TO SEARCH WAS NOT UNEQUIVOCAL, SPECIFIC AND VOLUNTARY?

V. DOES [POWELL] LACK STANDING WHEN HE DID NOT SHOW, AS THE PASSENGER, THAT HE HAD A LEGITIMATE EXPECTATION OF PRIVACY IN THE VEHICLE?

Commonwealth's Brief at 4.

¶ 5 The standard of review employed by an appellate court when reviewing the grant of a suppression motion has been summarized by our Supreme Court:

We begin by noting that where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. Pa.R.Crim.P. 323(h). *See Commonwealth v. Iannaccio*, 505 Pa. 414, 480 A.2d 966 (1984), *cert. denied*, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985). In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. *Commonwealth v. Monarch*, 510 Pa. 138, 147, 507 A.2d 74, 78 (1986). If so, we are bound by those findings. *Commonwealth v. James*, 506 Pa. 526, 533, 486 A.2d 376, 379 (1985). Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. *Commonwealth v. Hamlin*, 503 Pa. 210, 216, 469 A.2d 137, 139 (1983).

*Commonwealth v. DeWitt*, 530 Pa. 299, 608 A.2d 1030, 1031 (1992) (footnote omitted). Moreover, if the evidence supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusions drawn from those findings. *Commonwealth v. Reddix*, 355 Pa.Super. 514, 513 A.2d 1041, 1042 (1986).

¶ 6 We first address the Commonwealth's fourth issue regarding Solomon's consent to search, since the suppression court found that the lack of consent required suppression of the physical evidence. As this Court has recently summarized:

In connection with the inquiry into the voluntariness of a consent given pursuant to a lawful encounter, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coer-

cion, express or implied, or a will over-borne—under the totality of the circumstances. While knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. Additionally, although the inquiry is an objective one, the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account.

Since both the tests for voluntariness and for a seizure centrally entail an examination of the objective circumstances surrounding the police/citizen encounter to determine whether there was a show of authority that would impact upon a reasonable citizen-subject's perspective, there is a substantial, necessary overlap in the analyses.

\* \* \*

[Thus, we] conclude that the following factors ... are pertinent to a determination of whether consent to search is voluntary given: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

*Commonwealth v. Kemp*, 961 A.2d 1247, 1261 (Pa.Super.2008) (*en banc*) (citation omitted).

¶ 7 The suppression court concluded that Solomon did not provide a valid consent to search the vehicle he was driving:

In order for a consent to search to be valid it must be unequivocal, specific, and voluntary. *Commonwealth v. Stapinski*, 494 Pa. 283, 431 A.2d 260 (1981). Weighing all of the evidence, which most importantly includes the audio/visual recording, we find that despite what Corporal Miller's perception may have been, Solomon did not give an unequivocal, specific consent to search the Honda. Miller testified that he asked Solomon if he had a problem with his searching the car. On direct examination he testified that Solomon said "nah" and motioned toward his car. On cross-examination he testified that he wrote in his police report that Solomon said "yeah or something to that effect." Only by listening to and watching the audio/visual recording did we learn that following Solomon's response to Miller, whatever it was, Miller asked him a second time: "Is it okay to search it." No response can be heard on the audio recording. If there was a response Miller did not testify to it. What shows on the video is that Solomon again made a small gesture with his right hand toward the Honda and walked to the driver's door. Another trooper stopped him when he reached the door.

If Solomon said "nah," in response to Miller asking him if he had a problem with searching his car, that is not an unequivocal, specific consent. If he said "yeah or something to that effect," we still don't know exactly what he said. There not being an unequivocal, specific consent[,] it is not surprising that Miller asked a second time: "Is it okay to search it." No response by Solomon can be heard on the audio recording and Miller did not even testify to having asked him a second time for consent.

Additionally, Solomon's conduct in making another gesture with his right hand toward the Honda and walking to the driver's door, only to be stopped by another trooper, is inconsistent with his having just unequivocally consented to the search of the vehicle. On this evidence, we find that Solomon did not give his unequivocal, specific consent to search the Honda. Therefore, all evidence seized as a result of that search must be suppressed.

Suppression Court Opinion, 5/1/09, at 9–10.

¶ 8 Our review of the suppression transcript, as well as the audio/visual recording, supports the suppression court's conclusions. The Commonwealth argues that the suppression court's conclusion that Corporal Miller twice asked Solomon for consent is not supported by the record. Rather, according to the Commonwealth, " 'It's ok to search' was a confirmatory statement by Corporal Miller." Commonwealth's Brief at 26. Even if we were to agree with this characterization of Corporal Miller's statement, the fact that he sought confirmation and/or clarification of Solomon's initial response suggests that Solomon's first answer to the request to search was not unequivocal. Moreover, we agree with the suppression court that Solomon's hand gestures and movement following this inquiry by Corporal Miller are inconsistent with the grant of a consensual search. Thus, lacking a valid consent to search, the trial court properly determined that all evidence seized as a result of the subsequent search of the Honda's trunk should be suppressed.

¶ 9 Given this determination, we need not address the Commonwealth's first three issues. We must next consider, however, the Commonwealth's last issue in which it asserts that Powell lacked standing to seek suppression of the evidence seized from the Honda's trunk because he failed to demonstrate that, as a passenger, he had a reasonable expectation of privacy in the vehicle.

¶ 10 "The concept of standing in a criminal search and seizure context empowers a defendant to assert a constitutional violation and thus seek to exclude or suppress the government's evidence pursuant to the exclusionary rules under the Fourth Amendment of the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution." *Commonwealth v. Hawkins,* 553 Pa. 76, 718 A.2d 265, 266 (1998). As this Court has summarized:

A defendant moving to suppress evidence has the preliminary burden of establishing standing and a legitimate expectation of privacy. Standing requires a defendant to demonstrate one of the following: (1) his presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence improperly seized; (3) that the offense charged includes as an essential element the element of possession; or (4) a proprietary or possessory interest in the searched premises. A defendant must separately establish a legitimate expectation of privacy in the area searched or thing seized. *Commonwealth v. Hawkins,* 553 Pa. 76, 718 A.2d 265, 267 (1998); *Commonwealth v. Black,* 758 A.2d 1253, 1256–1258 (Pa.Super.2000); *Commonwealth v. Torres,* 564 Pa. 86, 764 A.2d 532, 542 (2001); [*Commonwealth v. Perea,* 791 A.2d 427, 429 (Pa.Super.2002) ]. Whether [a] defendant has a legitimate expectation of privacy is a component of the merits analysis of the suppression motion. *See Commonwealth v. Millner,* 585 Pa. 237, 888 A.2d 680, 691 (2005). The determination whether [a] defendant has met this burden is made upon evaluation of the evi-

dence presented by the Commonwealth and the defendant.

*Commonwealth v. Burton,* 973 A.2d 428, 435 (Pa.Super.2009) (*en banc* ).

¶ 11 In *Burton,* the defendant sought to suppress evidence seized after police searched a vehicle that he had been driving. In specific reference to an automobile search, we further explained:

Generally, under Pennsylvania law, a defendant charged with a possessory offense has automatic standing to challenge a search. However, in order to prevail, the defendant, as a preliminary matter, must show that he had a privacy interest in the area searched.

An expectation of privacy is present when the individual, by his conduct, exhibits an actual (subjective) expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable. The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances.

*Burton,* 973 A.2d at 435 (quoting *Commonwealth v. Jones,* 874 A.2d 108, 118 (Pa.Super.2005) (citations omitted)).

¶ 12 In *Burton,* the car that the defendant had been driving, and which was later searched by the police, was neither owned by the defendant nor registered in his name. Because the defendant did not present any evidence at the suppression hearing that he was using the vehicle with the authorization or permission of the registered owner, or otherwise explain his connection to the vehicle or its owner, this Court held that the defendant "failed to demonstrate that he had a reasonably cognizable expectation of privacy in [the] vehicle[.]" *Burton,* 973 A.2d at 436. *See also Jones,* 874 A.2d at 119–20 (holding that the operator of a rental car did not have a privacy interest sufficient to challenge the constitutionality of a search of the rental car since he was not an authorized driver and the rental agreement had expired).

¶ 13 Establishment of the expectation of privacy in a searched vehicle applies not only to drivers, but also to its passengers. In *Commonwealth v. Viall,* 890 A.2d 419 (Pa.Super.2005), the police stopped a car in which the defendant was a passenger. After the driver gave police permission to search the vehicle, drugs and paraphernalia were found in the backseat area where the defendant, as well as two others, had been seated. This Court affirmed the suppression court's denial of Viall's suppression motion, reasoning:

Here [Viall] challenges the consent to search given by [the driver of a vehicle in which he was a passenger] and we must address whether [he] had an expectation of privacy in the backseat area of the car [in which] he was traveling so as to enable him to challenge the validity of the consent given to search that area.

In ascertaining [Viall's] privacy interest, the trial court likened its analysis to that employed when a visitor to a home seeks to challenge the consent given to a search of that home. In such cases the controlling consideration is whether the individual challenging the search and seizure has a legitimate expectation of privacy in the premises or area to be searched. *See Commonwealth v. Davis,* 743 A.2d 946, 950 (Pa.Super.1999). It has been held that "a casual visitor who is merely present in [another] person's home does not have a legitimate expectation of privacy to contest an illegal entry by police into that home" and in order for such an individual to establish an expectation of privacy that individual must demonstrate a significant and cur-

rent interest in the searched premises. *Commonwealth v. Govens*, 429 Pa.Super. 464, 632 A.2d 1316, 1319 (Pa.Super.1993). *See also Davis*, 743 A.2d at 950 (ruling that the appellant had a legitimate expectation of privacy in the premises although he was not a named lessee where he carried a key to the apartment, and inside the apartment were the appellant's clothes, identification tag and prescription medicine); *Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115, 1118 (Pa.1993) (finding guest in motel room has legitimate expectation of privacy in room during period of time it is rented).

We find the analogy employed by the trial court useful. Much as a visitor would not have a legitimate privacy interest in the entire area of another's home absent circumstances indicating otherwise, an ordinary passenger in an automobile does not by his mere presence have a legitimate expectation of privacy in the entire passenger compartment of that vehicle. While passengers in an automobile may maintain a reasonable expectation of privacy in the contents of luggage they placed inside an automobile, *see United States v. Padron*, 657 F.Supp. 840, 847 (D.Del.1987), it would be unreasonable to maintain a subjective expectation of privacy in locations of common access to all occupants.

*Viall*, 890 A.2d at 422–23. According to the *Viall* panel, "it would be unreasonable for [Viall] to have expected to maintain a privacy interest in objects which were placed inside the car but not shielded from the view of the [others] occupying the small place." *Viall*, 890 A.2d at 423.

¶ 14 The present case involves the reasonable expectation of privacy a passenger of a searched vehicle has in the contents of the vehicle's trunk. Although not involving an occupant of a vehicle or items found in the vehicle's trunk, our Supreme Court's decision in *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680 (2005) is instructive. In *Millner*, police were on routine patrol when they heard gunshots. After learning through dispatch of a report of gunshots in the area, the police came upon two men standing outside of a parked vehicle, one of whom was holding a large handgun. As the police approached the two men, they saw Millner place the gun into the back of the car through an open window. As the police officers approached the men and identified themselves, Millner quickly closed the vehicle's trunk and the other man threw a clear plastic bag to the ground. The officers discovered that the plastic bag contained drugs. They then patted down Millner and found forty-one packets of crack cocaine. After placing him under arrest, the police found $449.00 on Millner's person and they subsequently seized the gun out of the backseat of the vehicle.

¶ 15 Prior to trial, Millner sought to have the gun suppressed. The trial court suppressed the gun on the basis that no exception applied to the police's warrantless entry into the vehicle. In so doing, the trial court did not address the Commonwealth's argument that Millner had no expectation of privacy in the vehicle. This Court affirmed the suppression of the handgun. Although the unanimous panel recognized that Millner had no expectation of privacy in the vehicle, the panel reasoned that it did not have to address the claim because "the Commonwealth had failed to meet its 'initial burden of proof to demonstrate at the suppression hearing, that there was some [possessory] connection between [Millner] and the gun.'" *Millner*, 888 A.2d at 685.

¶ 16 In discussing a defendant's preliminary burden at a suppression hearing, our Supreme Court in *Millner* first discussed

its previous decision in *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983):

In *Sell,* we held that, under Article [1], Section 8 of the Pennsylvania Constitution, a criminal defendant charged with a possessory offense has "automatic standing" to pursue a motion to suppress evidence where that evidence (most typically, contraband or firearms) forms the very basis for the possessory crime, and the claim is that the evidence was the fruit of an unlawful seizure. The *Sell* Court viewed its automatic standing holding as significantly more protective of privacy rights than then-emerging Fourth Amendment jurisprudence from the U.S. Supreme Court, which had moved away from a preliminary standing analysis and adopted a substantive approach which analyzed Fourth Amendment claims by focusing on whether the challenged search or seizure implicated a reasonable and legitimate privacy expectation that was personal to the defendant. *See, e.g., Rawlings v. Kentucky,* [448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ]; *United States v. Salvucci,* [448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) ]; *Rakas v. Illinois,* [439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ]. The *Sell* Court noted that, under *Rakas* [,] *Salvucci* and *Rawlings,* the "sole determinant of the scope of protection afforded" under the Fourth Amendment was the defendant's "ability to prove a 'legitimate expectation of privacy' by the 'totality of the circumstances.' " [*Sell,*] 470 A.2d at 466.

After analyzing Article [1], Section 8, and recognizing this Court's authority to find greater protection of privacy rights under our state charter, the *Sell* Court noted:

We decline to undermine the clear language of Article [1], section 8 by making the Fourth Amendment's amorphous "legitimate expectation of privacy" standard a part of our state guarantee against unreasonable searches and seizures. We do so not only because we find the United States Supreme Court's analytical distinction between "standing" and "threshold substantive question," *see Rakas, supra* [439 U.S. at 139 n. 7, 99 S.Ct. 421], unhelpful to our interpretation of Article [1], section 8's protection, but also because we believe the United States Supreme Court's current use of the "legitimate expectation of privacy" concept needlessly detracts from the critical element of unreasonable governmental intrusion.

[*Sell,*] 470 A.2d at 468.

*Millner,* 888 A.2d at 689–90. The *Millner* Court then noted that, despite the Sell Court's "rather broad criticism" of the federal approach to search and seizure questions used in *Rakas/Salvucci/Rawlings,* its holding was very narrow. *Millner,* 888 A.2d at 690. In *Sell,* our Supreme Court remanded the case so that Sell, who was charged with receiving stolen property but was not present when the search warrant was executed, could challenge the constitutionality of the search.

¶ 17 The *Millner* Court also noted that, after the *Sell* decision, "some confusion arose concerning what burden, if any, the Pennsylvania automatic standing defendant had in a suppression hearing, particularly in light of the U.S. Supreme Court's focus upon a defendant's reasonable expectation of privacy in assessing Fourth Amendment claims." *Id.* The *Millner* Court then proceeded to thoroughly discuss subsequent cases that tackled this issue. From these cases, the high court concluded:

[I]t is clear that, notwithstanding the *dicta* in *Sell* criticizing the substantive

federal approach to Fourth Amendment claims, under Article [1], Section 8, no less than under the Fourth Amendment, a defendant cannot prevail upon a suppression motion unless he demonstrates that the challenged police conduct violated his own, personal privacy interests. *Millner*, 888 A.2d at 692. In *Millner*, not only did Millner fail to produce any evidence that he had an expectation of privacy in the vehicle, he presented evidence tending to show that he had no connection to it. Because of Millner's failure to establish a subjective expectation of privacy in the vehicle, the *Millner* Court reasoned that "there was no need for the Commonwealth to establish the lawfulness of the police entry into the vehicle and the seizure of the firearm, and there was no basis upon which the [trial] court could properly order its suppression." *Id.* Thus, the *Millner* Court reversed this Court to the extent it affirmed the suppression of the firearm seized and remanded for further proceedings.

¶ 18 Our Supreme Court in *Millner* essentially aligned this Court's search and seizure jurisprudence with respect to a defendant's establishment of a personal expectation of privacy in a searched vehicle with federal jurisprudence as established in cases such *Rakas, supra; Salvucci, supra;* and *Rawlings, supra.* In *Rakas*, the passenger of a searched car, in which rifle shells were found in the locked glove compartment and a sawed-off rifle found under the front passenger seat, sought to suppress these items on the basis that his Fourth Amendment rights were violated. At the suppression hearing, Rakas "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." *Rakas*, 439 U.S. at 148, 99 S.Ct. 421. Given these circumstances the United States Supreme Court found that Rakas did not establish an expectation of privacy such that his personal

Fourth Amendment rights were violated. "Here ... [Rakas] made no showing that [he] had a legitimate expectation of privacy in the glove compartment or area under the seat of the car in which [he] was merely [a passenger]. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Rakas*, 439 U.S. at 149, 99 S.Ct. 421.

¶ 19 In the present case, Powell submitted no evidence at the suppression hearing to demonstrate that he had any privacy interest in the trunk of the vehicle in which he was a passenger. According to the Commonwealth's evidence, the Honda was registered to a third person, Solomon was operating it, and Powell had no connection to the vehicle whatsoever. Given these circumstances, the suppression court erred in granting Powell's suppression motion.

¶ 20 While we have already determined that the suppression court properly granted Solomon's motion, and it may appear somewhat incongruous to not reach the same result for Powell, Article 1, Section 8, of our state constitution, as well as the Fourth Amendment of the United States Constitution, does not permit a defendant to vicariously assert the privacy rights of others:

> The polestar of the expanded protection afforded by Article 1, Section 8, which distinguishes it from its federal counterpart, is its emphasis upon personal privacy interests. In keeping with the historical intention of Article 1, Section 8, this Court has repeatedly refused to recognize the vicarious assertion of constitutional rights.
>
> *     *     *
>
> [I]n consistently declining to recognize derivative standing, this Court has spo-

ken directly to the policy considerations underlying Article 1, Section 8:

> The fourth amendment to the Constitution of the United States guarantees that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." To the same effect is Pa. Const. art. [1], § 8, P.S. These rights are personal in nature. There is no necessity to exclude evidence against one person in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. In order to obtain standing to challenge the legality of the search, a defendant must establish that he, rather than another, was the victim of an invasion or privacy.

*Hawkins*, 718 A.2d at 269 (citations omitted). Stated differently, under both our state and the federal constitutions, "a defendant cannot prevail upon a suppression motion unless he demonstrates that the challenged police conduct ***violated his own, personal privacy interests***." *Millner*, 888 A.2d at 692 (emphasis added). Because Powell did not establish that his personal privacy rights were violated, he cannot prevail in his attempt to suppress the contraband found by the police in this case.

¶ 21 Order affirmed in part and reversed in part. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.