J-A24021-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| FARID BROWN, | |
| Appellee | No. 2370 EDA 2013 |

Appeal from the Order July 18, 2013
in the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0002004-2013

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED FEBRUARY 13, 2015**

The Commonwealth appeals from the order of July 18, 2013, which granted the motion of Appellee, Farid Brown, to suppress.[1]  After review, we are constrained to reverse and remand.

On November 8, 2012, uniformed Philadelphia Police Officer Daniel Mason and his partner were patrolling in the area around 64th and Callowhill Streets, in a marked patrol car.  (**See** N.T. Suppression Hearing, 7/11/13, 8-

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth may take an appeal of right from an order that does not end the entire case if it certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.  **See** Pa.R.A.P. 311(d); **see also Commonwealth v. Torres**, 764 A.2d 532, 536 n.2 (Pa. 2001). The Commonwealth has included such a certification in this case.

9). At approximately 11:00 a.m., Officer Mason observed a black Chevrolet Malibu drive through a stop sign. (*See id.* at 9-10). Appellee was the passenger in the car, which co-defendant Andrew Cohn drove. (*See id.* at 11).[2]

The police officers put on their lights and sirens, and attempted to make a motor vehicle stop. (*See id.* at 11-12). However, Cohn and Appellee did not pull over; instead, they sped away. (*See id.*). The police officers briefly lost sight of the car. (*See id.* at 12-13). Then they observed the car parked in a drug store parking lot, approximately two blocks away from where they had last seen the car. (*See id.* at 13). The police officers saw Cohn walking near the entrance to the parking lot; when Cohn saw the police car pulling into the parking lot he fled. (*See id.* at 13-14). Appellee fled in the opposite direction. (*See id.* at 14-15, 22).

The police officers gave chase and captured Cohn and brought him back to the car. (*See id.* at 15). Cohn did not have keys for the car and denied any knowledge of the car. (*See id.* at 15-16, 23-24). The police officers ran a check on the vehicle and determined that it was registered to two women, Erica McKnight and Christine Jackson, who lived in King of Prussia. (*See id.* at 16).

_____

[2] Officer Mason recognized Appellee immediately based upon previous encounters. Officer Mason was not familiar with Cohn but noted that he had distinctive tattoos on his face. (*See id.* at 29).

Based upon this information, Officer Mason believed the car was stolen and entered it to look for a registration card, but could not find one. (*See id.* at 16-17). While looking for the registration card, Officer Mason observed that the plastic casing surrounding the gear shift was damaged. (*See id.* at 17-18). Officer Mason stated that the clips that held it together had been "popped open." (*Id.* at 17-18). Officer Mason lifted up the broken part and saw a gun. (*See id.* at 18-19). Later, police returned Appellee back to the scene, where Officer Mason identified him as the passenger. (*See id.* at 30). The police also learned that, in fact, no one had stolen the car. (*See id.* at 19).

The Commonwealth charged Appellee with several gun-related offenses. On July 8, 2013, Appellee filed an omnibus pre-trial motion to suppress. A hearing on the motion took place on July 11 and 18, 2013. At the hearing, the Commonwealth presented the testimony of Officer Mason, and Appellee presented the testimony of Erica McKnight, one of the owners of the car.

McKnight testified that she and her mother owned the car. (*See* N.T. Suppression Hearing, 7/18/13, at 7). She stated that, in November 2012, Appellee lived with her family. (*See id.* at 6). McKnight further testified that Appellee had permission to use the car. (*See id.* at 7).

On cross-examination, McKnight admitted that she gave a statement to police in May 2013, wherein she claimed that she and Appellee were not

"boyfriend/girlfriend" at the time of the incident but had, "just started talking." (*Id.* 9, 16, 20-21). In the statement, McKnight stated that she had loaned the car to a third party, her best friend, that day. (*See id.* at 9, 16, 18-19). McKnight claimed that her best friend lent the car to a third party. (*See id.* at 18-19). While not explicitly saying that her best friend had permission to loan the car to someone else she testified, "I mean, I trust her. I trust if she lends it out." (*Id.* at 19). After further explaining that she was unconcerned if the third party lent the car to other people, McKnight again testified that, as far as she knew, Appellee did not have her car that day.[3] (*See id.* at 19-21). The following exchange then took place between the Commonwealth and McKnight:

Q. So if you didn't know that [Appellee] had your car that day, how did he have permission to have your car that day?

A. Because who I left permission with allowed permission, whoever to have permission of my car. I left permission with my best friend, and she left permission with whoever. She gave it —

Q. With whoever?

A. Whoever she lent it to.

Q. Okay.

A. I don't know for sure —

_____

[3] There was no testimony regarding how Cohn, the driver, came into possession of the car that day. (*See id.* at 6-30).

- 4 -

Q. And you agree with me that that person was — you already identified as Christopher Wilson (sic), correct?

A. I don't know for sure who it was because I was not around, I was not there, so I'm not positive.

Q. But you'll agree with me that's what you told Detective Sellers, correct?

A. Yes, but I wasn't — I let her know I was not positive with that either. She knows that.

Q. She knows you're not positive?

A. She knew that I wasn't positive when I went in and she questioned me. She knew I was not positive about that at all.

Q. About what?

A. About who was handed the keys. Once I gave them to my best friend, I went to school for the day.

Q. Okay. And you let your best friend know that she had permission to give the car to anybody?

A. Yes.

Q. Okay. And that was okay with you?

A. That she lent the car out?

Q. Yes.

A. Yes. That was okay with me.

(*Id.* at 22-23). McKnight further acknowledged that she had told the police that, while Appellee had permission to use her car, he did not have permission to take it into Philadelphia. (*See id.* at 23-24). However, at the hearing, McKnight equivocated, stating she could not know if he disobeyed

her instructions and that she did not "like" him to take the car into Philadelphia. (*Id.* at 25, 26; *see also id.* at 24-26).

Immediately following the hearing, the trial court granted the motion to suppress. (*See id.* at 35-36). On August 19, 2013, the Commonwealth filed the instant, timely appeal, accompanied by a statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). On December 19, 2013, the trial court filed an opinion. *See* Pa.R.A.P. 1925(a).

On appeal, the Commonwealth raises the following question for our review:

> Did the [trial] court err in suppressing a handgun seized from a car, where [Appellee] — who had been a passenger before getting out and fleeing — abandoned the car and lacked a reasonable expectation of privacy in the area searched?

(Commonwealths' Brief, at 4).

The Commonwealth challenges the trial court's grant of Appellee's motion to suppress. When the Commonwealth appeals from a suppression order, this Court follows a clearly defined scope and standard of review: we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. *See Commonwealth v. Henry*, 943 A.2d 967, 969 (Pa. Super. 2008), *appeal denied*, 959 A.2d 928 (Pa. 2008). This Court must first determine whether the record supports the factual findings of the suppression court and then determine the reasonableness of the inferences and legal conclusions drawn from those findings. *See id.* Here,

because our review of the record demonstrates that it does not support the factual findings of the suppression court and that the inferences and legal conclusions that the court drew were not reasonable, or legally correct, we are constrained to reverse.

We note that, based upon our recitation of the facts above, the trial court's blanket statement that the owner of the car had given Appellee permission to operate it on the date in question is a mischaracterization of the testimony. (*See* Trial Court Opinion, 12/19/13, at 3). Based upon the testimony of Erica McKnight, it is, at best, questionable that Appellee had permission to use the vehicle on that date. (*See* N.T. Suppression Hearing, 7/18/13, at 17-24).

Moreover, even if we were to agree that Appellee had McKnight's permission to drive the vehicle that day, the trial court does not address whether Appellee, as a lawful passenger,[4] had a reasonable expectation of privacy in a gearshift box. (*See* Trial Ct. Op., at 3-4).

Appellee was not the driver that day. (*See* N.T. Suppression Hearing, 7/11/13, at 11). It is long-settled that a passenger does not have a

---

[4] While, as discussed above, McKnight inconsistently testified that Appellee had some type of general permission to drive the car in certain locales, (*see* N.T. Suppression Hearing, 7/18/13, at 17-24), it is uncontradicted that Appellee was a passenger that night. (*See* N.T. Suppression Hearing, 7/11/13, at 11). There is simply no legal support for the notion that a lawful passenger can be given the same rights as a lawful driver simply because he may, at other times, have had permission to drive the vehicle.

reasonable expectation of privacy in all areas of a car. ***See Rakas v. Illinois***, 439 U.S. 128, 148-49 (1978) (passengers in car had no legitimate expectation of privacy in glove box or in area under passenger seat); ***Commonwealth v. Brown***, 64 A.3d 1101, 1107 (Pa. Super. 2013), *appeal denied*, 79 A.3d 1096 (Pa. 2013) (appellant had no legitimate expectation of privacy in trunk of vehicle owned by another person); ***Commonwealth v. Powell***, 994 A.2d 1096, 1107 (Pa. Super. 2010), *appeal denied*, 13 A.3d 477 (Pa. 2010) (passenger had no legitimate expectation of privacy in car's trunk); ***Commonwealth v. Atkinson***, 987 A.2d 743, 753 (Pa. Super. 2009), *appeal denied*, 8 A.3d 340 (Pa. 2010) (passengers in car had no legitimate expectation of privacy in entire passenger compartment); ***Commonwealth v. Viall***, 890 A.2d 419, 422-24 (Pa. Super. 2005) (appellant did not have legitimate expectation of privacy in common backseat area of car in which he was one of four passengers). Thus, the trial court's conclusion that Appellee had a legitimate expectation of privacy in a broken gearshift box of a car owned by a third party is not supported by law. ***See Rakas***, ***supra*** at 148-49; ***Brown***, ***supra*** at 1107; ***Powell***, ***supra*** at 1107; ***Atkinson***, ***supra*** at 753; ***Viall***, ***supra*** at 422-24.

Further, even if Appellee had a legitimate expectation of privacy in the gearshift box, the trial court erred in granting his motion to suppress because the record plainly establishes that Appellee abandoned the vehicle.

Our Supreme Court has stated:

> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.
>
> Moreover, it is well settled that no one has standing to complain of a search or seizure of property that he has voluntarily abandoned.

*Commonwealth v. Shoatz*, 366 A.2d 1216, 1220 (Pa. 1976) (citations omitted).

Here, the record establishes that Police Officer Daniel Mason, who was in a marked police vehicle, saw Appellee's co-defendant (the driver) run a stop sign. When he activated the lights and sirens, the driver sped up and attempted to flee. Officer Mason lost sight of the car for approximately one minute and drove an additional two blocks. He first saw the driver in a Walgreens parking lot, and then observed the car parked there. Upon seeing the police, Appellee and the driver fled in opposite directions. (*See* N.T. Suppression Hearing, 7/11/13, at 8-14). Officer Mason apprehended the driver who did not have keys to the car and disavowed any affiliation with the vehicle. (*See id.* at 15).

The trial court has failed to provide any legal support for its holding that the fact that the driver parked the car in a parking lot, with closed doors

- 9 -

and no keys, precludes a finding of abandonment. (**See** Trial Ct. Op., at 4). One could equally argue that the fact that the driver and Appellee left the car unlocked, as the police officers were able to gain immediate entry, was absolute indicia of abandonment. (**See** N.T. Suppression Hearing, 7/11/13, at 17).

Here, where the totality of the circumstances demonstrates that Appellee, whom the police were pursuing, exited from the car, and then ran away, the Commonwealth amply demonstrated that the driver and Appellee abandoned the car. **See Shoatz**, **supra** at 1220 (suspects' conduct in dropping suitcases and attempting to flee indicated clear intent to relinquish control of luggage and any expectation of maintaining privacy in its contents); **see also U.S. v. Vasquez**, 635 F.3d 889, 894 (7th Cir. 2011), *cert. dismissed as improvidently granted*, 132 S.Ct. 1532 (2012) (suspect, being pursued by police, abandoned car parked in Walmart parking lot, when he left car and ran away); [5] **U.S. v. Pittman**, 411 F.3d 813, 817 (7th Cir. 2005) ("If the driver of a car flees at the approach of the police, this is pretty good evidence that he's abandoned the car—that he doesn't want to be associated with it and therefore isn't going to reclaim it."); **Wilson v.**

---

[5] "While we recognize that federal court decisions are not binding on this court, we are able to adopt their analysis as it appeals to our reason." **Kleban v. Nat. Union Fire Ins. Co. of Pittsburgh**, 771 A.2d 39, 43 (Pa. Super. 2001).

*State*, 966 N.E.2d 1259, 1262-64 (Ind. Ct. App. 2012), *transfer denied*, 971 N.E.2d 99 (Ind. 2012) (defendant abandoned car, when, after being followed by police, he parked car in parking lot and fled on foot).[6]  Thus, the trial court erred in finding that Appellee had not abandoned the car and in granting suppression on that basis.

Accordingly, we reverse the decision of the trial court granting suppression and remand for trial.

Order reversed.  Case remanded.  Jurisdiction relinquished.

President Judge Gantman joins the Memorandum.

President Judge Emeritus Bender files a Dissenting Memorandum.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/2015

---

[6] "The decisions of courts of other states are persuasive, but not binding, authority."  **Huber v. Etkin**, 58 A.3d 772, 780 n.7 (Pa. Super. 2012) (*en banc*), *appeal denied*, 68 A.3d 909 (Pa. 2012) (citation omitted).