J-S17016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARISSA EHRMAN, | |
| Appellant | No. 610 WDA 2014 |

Appeal from the Judgment of Sentence March 20, 2014
In the Court of Common Pleas of Butler County
Criminal Division at No(s): CP-10-CR-0001891-2012

BEFORE:  GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED APRIL 24, 2015**

Appellant, Marissa Ehrman, appeals from the judgment of sentence entered following her conviction of possession of drug paraphernalia.  We affirm.

The trial court, in its opinion issued denying Appellant's motion to suppress, set forth the relevant facts of this case as follows:

> At hearing, Officer Anthony Fatta of the Butler City Police testified that he has been a police officer for twelve (12) years. He testified that on September 1, 2012, he responded to the Greenview Garden Apartments, apartment # 2B, to a female who had overdosed.  When he arrived, the emergency medical personnel were providing treatment to [Appellant].  . . .  Officer Fatta noted the presence of children's toys and clothing in the apartment.

---

[*]  Former Justice specially assigned to the Superior Court.

After [Appellant] was revived, Officer Fatta, concerned that others might come into contact with the drugs and paraphernalia, asked [Appellant] to tell him where the needles and drugs were located. At first [Appellant] wouldn't say, but after the officer asked her a second time, [Appellant] complied and told the officer that they were located in the top dresser drawer in her bedroom. Officer Fatta testified that [Appellant] was coherent and understood his question and that he did not threaten or restrain her.

Suppression Court Opinion, 9/6/13, at 1.

Officer Fatta recovered eight syringes, four burnt spoons with residue on them, and five empty stamp bags from Appellant's dresser drawer. Appellant was charged with possession of drug paraphernalia. Thereafter, Appellant filed a pretrial motion seeking to suppress the evidence seized by the police. Following a suppression hearing, the trial court denied Appellant's pretrial motion.

On January 27, 2014, a jury convicted Appellant of the crime stated above. On March 20, 2014, the trial court sentenced Appellant to serve a term of probation of six months. This timely appeal followed.

Appellant presents the following issue for our review:

I. Did the trial court err in denying [Appellant's] motion to suppress evidence seized as a result of a warrantless search where the Commonwealth failed to establish by clear and convincing evidence that exigent circumstances existed or that valid consent was obtained?

Appellant's Brief at 7 (full capitalization omitted).

In her sole issue, Appellant argues that the trial court should have suppressed the evidence recovered by the police officer in Appellant's

bedroom dresser. Initially, Appellant contends that there were no exigent circumstances that would have permitted the police to conduct a warrantless search. In addition, Appellant asserts the evidence should have been suppressed because her consent to the search was not voluntary. Appellant maintains that, although she consented to the search, under the circumstances, she did not give a voluntary consent. We first review Appellant's allegation that she did not voluntarily consent to the search.

The standard of review an appellate court applies when considering an order denying a suppression motion is well established. An appellate court may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. ***Commonwealth v. Russo***, 934 A.2d 1199, 1203 (Pa. 2007) (citing ***Commonwealth v. Boczkowski***, 846 A.2d 75 (Pa. 2004)). Where the record supports the factual findings of the trial court, the appellate court is bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. ***Id***. However, it is also well settled that the appellate court is not bound by the suppression court's conclusions of law. ***Id***. (citing ***Commonwealth v. Duncan***, 817 A.2d 455 (Pa. 2003)).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. However, where the factual determinations made by the suppression court are not supported by the evidence, we may reject those findings.

Only factual findings which are supported by the record are binding upon this [C]ourt.

***Commonwealth v. Benton***, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citations omitted). In addition, questions of the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. ***Commonwealth v. Freidl***, 834 A.2d 638, 641 (Pa. Super. 2003).

Moreover, Pennsylvania Rule of Criminal Procedure 581, which addresses the suppression of evidence, provides in relevant part as follows:

(H) The Commonwealth shall have the burden . . . of establishing that the challenged evidence was not obtained in violation of the defendant's rights.

Pa.R.Crim.P. 581(H).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." ***Schneckloth v. Bustamonte***, 412 U.S. 218, 236, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); ***Commonwealth v. Blair***, 394 Pa. Super. 207, 575 A.2d 593, 596 (Pa. Super. 1990).

***Commonwealth v. By***, 812 A.2d 1250, 1254 (Pa. Super. 2002).

To secure the right of citizens to be free from intrusions by police, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive. ***Commonwealth v. Beasley***, 761 A.2d 621, 624 (Pa. Super. 2000).

It is undisputed that:

- 4 -

[s]tate case law recognizes three categories of interaction between police officers and citizens, which include: (1) a mere encounter, or request for information, which need not be supported by any level of suspicion, but which carries no official compulsion to stop or to respond; (2) an investigative detention, which must be supported by reasonable suspicion as it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest; and (3) arrest or custodial detention, which must be supported by probable cause.

*Commonwealth v. Acosta*, 815 A.2d 1078, 1082 (Pa. Super. 2003) (*en banc*).

If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. *Commonwealth v. Boswell*, 721 A.2d 336, 340 (Pa. 1998). "Because the level of intrusion into a person's liberty may change during the course of the encounter, we must carefully scrutinize the record for any evidence of such changes." *Commonwealth v. Blair*, 860 A.2d 567, 572 (Pa. Super. 2004) (citing *Commonwealth v. Strickler*, 757 A.2d 884 (Pa. 2000)). In determining whether a mere encounter has risen to the level of an investigative detention, our inquiry focuses on whether the individual in question has been seized.

To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in the view of all surrounding circumstances, a reasonable person would believe that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-

- 5 -

circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

***Strickler***, 757 A.2d at 889-890 (citations omitted).

We have long considered the following factors in analyzing the conditions surrounding the escalation of police and citizen interactions:

> Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked.

***Beasley***, 761 A.2d at 624-625 (quoting ***Boswell***, 721 A.2d at 340). Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. ***Id***.

Additionally, we have stated that "there is no threshold of suspicion needed for a request to search; consent to a search obviates the need for any level of suspicion on the part of the police." ***Commonwealth v. Shelly***, 703 A.2d 499, 502 (Pa. Super. 1997) (citing ***Florida v. Bostick***, 501 U.S. 429 (1991)). It is a well-established standard that a warrant is not required when a person, with authority to do so, consents to a search. ***Commonwealth v. Reid***, 811 A.2d 530 (Pa. 2002). "To establish a valid consensual search, the prosecution must first prove that the consent was given during a legal police interaction, or if the consent was given during an illegal seizure, that it was not a result of the illegal seizure; and second, that the consent was given voluntarily." ***Id***. at 544.

To establish the constitutionality of a consent to search,

the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. As noted, while knowledge of the right to refuse to consent to the search is a factor to be taken into account, the Commonwealth is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. Additionally, although the inquiry is an objective one, the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account.

**Strickler**, 757 A.2d at 901 (citations omitted).

We have indicated that the following factors are pertinent to a determination of whether consent to search is voluntarily given:

1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including the degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

**Commonwealth v. Powell**, 994 A.2d 1096, 1102 (Pa. Super. 2010) (quoting **Commonwealth v. Kemp**, 961 A.2d 1247, 1261 (Pa. Super. 2008) (*en banc*)).

Our review of the record reflects that the search of Appellant's dresser drawer was not conducted pursuant to any type of detention of Appellant and was consensual. Specifically, testimony at the suppression hearing indicated that at 7:00 p.m. on September 1, 2012, Patrolman Anthony Fatta

of the Butler City Police Department was dispatched to Appellant's residence to assist the Butler Ambulance Service with a "female overdose patient." N.T., 7/8/13, at 3-4. Patrolman Fatta explained that his purpose in responding to an overdose is "primariliy to assist fire department and/or EMS" and "to make sure that there [aren't] any … unkempt needles or drug paraphernalia at the scene." *Id*. at 4. Patrolman Fatta indicated that it is typical for a police officer to respond to every overdose call. *Id*. at 4-5.

Patrolman Fatta further testified that when he arrived at the scene, there were at least three emergency responders attending to Appellant, and the officer had been advised that Appellant was administered a shot of Narcan. *Id*. at 7, 5. Patrolman Fatta also offered the following regarding a conversation about the location of drug paraphernalia:

> Q. And you said that there was a concern for the location of the paraphernalia. There was a conversation with regard to that, is that correct?
>
> A. Yes. Usually, from my experience, if an individual overdoses of that nature, usually it's somewhere nearby or they are laying on top of it. So, we checked that immediate area, and it wasn't there. And that's what led us to believe either someone moved it or [Appellant] moved it … somewhere.

*Id*. at 7. Patrolman Fatta also stated the following:

> Once [Appellant] came back to she was questioned on where the drug paraphernalia was because … [i]t was apparent that either someone cleaned it or it was put away by someone due to the nature of her use [of] the heroin. So, we evaluated the situation. And being that there [were] small children inside this residence, there was, you know, from the numerous toys and clothing that was around, we decided it was imperative for us to locate where [it was].

- 8 -

*Id*. at 5.

In addition, the following is reflective of the fact that Appellant provided a voluntary verbal consent to the search of her dresser drawer in an effort to locate the drug paraphernalia, following a non-coercive discussion with Patrolman Fatta:

Q.  And the paramedics were able to revive [Appellant], is that correct?

A.  Yes.

Q.  And she was communicative at that point?

A.  Yes.

Q.  Okay.  Did you have any trouble understanding her?

A.  No.

Q.  Did she have – appear to have any trouble understanding you at that point?

A.  No.  She – once they administered their Narcan, she was back – back to normal.

Q.  Okay.  And did you ask her about the location of any paraphernalia in the apartment?

A.  Yeah.

Q.  Okay.  Describe that conversation for the Judge.

A.  It was basically as you stated, it was to the point where, you know, where are the needles, where [are] the empty stamp bags.  Like I said, we were concerned for the children, or, you know, anyone's well-being or whoever was going to take care of them.

Q.  This was all during the course of the treatment[,] as well[,] the paramedics were administering?

A. Yes. That was right before she was transported to Butler Memorial [Hospital]. That was prior to her leaving.

Q. How would you characterize the tone of voice you used with her during this conversation?

A. No different than where we're at. Maybe a little bit sterner. I would say, to locate where the said items were.

Q. And on how did you put it to her, how did you ask her about the paraphernalia?

A. I just flat out asked her, ["]where is the – where is [sic] the needles or where is [sic] the empty stamps bags you used.["]

Q. And how did she respond to that?

A. At first she was a little hesitant obviously providing that information. And the, you know, like I said, we used a little bit sterner, sterner tone with her. And we discovered that it was in her – in a dresser drawer. It's one of the --

Q. Were there any threats used?

A. Oh, no.

Q. Was she constrained in any fashion?

A. Huh – huh.

Q. Any handcuffs or anything like that?

A. No.

Q. Was she in a position to refuse your question, if she so desired?

A. I don't see why not. She wasn't under arrest or anything.

Q. And you weren't – you didn't use any commands with her, is that correct?

A. Right.

Q. That ["]you have to tell me[,"] or anything along those lines?

A. Right.

Q. And she told you where to look for – where the paraphernalia was then?

A. Yes.

*Id*. at 7-10. In addition, Patrolman Fatta stated that the length of the conversation with Appellant regarding the location of the drug paraphernalia lasted "[l]ess than a minute." *Id*. at 13.

Because consent was given during a legal police interaction, we need address only whether the consent was voluntary. Here, the police activity preceding the consent was legitimate, no verbal or physical force was used, one police officer was involved along with the emergency responders, and there were no police excesses. Although Appellant had undergone a temporary medical emergency, there was no evidence that Appellant was anything other than a competent adult at the time she provided the police officer with the requested information and consent to retrieve the contraband. Furthermore, our review has indicated no duress or coercion on the part of the police in securing the verbal consent of Appellant to search the dresser drawer. The record supports the trial court's determination with regard to the evidence seized, and Appellant's contrary claim with regard to the suppression order lacks merit. Having concluded that Appellant's consent to the search of the dresser drawer was voluntary, we need not address the portion of her argument pertaining to whether there were exigent circumstances that would have permitted the police to conduct a warrantless search of the residence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/24/2015