**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Braheim Jamier GOLDSBOROUGH, Appellee.**

Superior Court of Pennsylvania.

Argued June 21, 2011.

Filed Oct. 28, 2011.

Michelle P. Hutton, Assistant District Attorney, Media, for Commonwealth, appellant.

Jacquie L. Jones, Media, for appellee.

BEFORE: STEVENS, P.J., GANTMAN, and OTT, JJ.

OPINION BY GANTMAN, J.:

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Delaware County Court of Common Pleas, granting the motion of Appellee, Braheim Jamier Goldsborough, to suppress evidence obtained following his arrest for multiple drug offenses.[1] We reverse and remand for further proceedings.

The suppression court's findings of fact set forth the relevant facts of this appeal as follows:

1. [Appellee] was arrested on February 5, 2009, and charged with numerous violations of the Controlled Substance, Drug Device and Cosmetic Act.

2. At the Suppression hearing, Pennsylvania State Trooper Michael Skahill, an undercover officer with Troop K, Philadelphia Vice Narcotics Unit of the Pennsylvania State Police for eleven years, testified that he had been involved in over 200 drug arrests in his career. He has spoken to over 500 individuals who are involved in cocaine trafficking. His duties involved conducting undercover drug investigations, including handling confidential informants, preparing search and arrest warrants and conducting electronic surveillance. In addition, he testified to his training

---

1. Pursuant to Pa.R.A.P. 311(d), the Commonwealth has certified in its notice of appeal that the trial court's suppression order substantially handicapped or terminated the prosecution of the Commonwealth's case. Accordingly, this appeal is properly before us for review. *See Commonwealth v. Cosnek,* 575 Pa. 411, 836 A.2d 871 (2003) (stating Rule 311(d) applies to pretrial ruling that results in suppression, preclusion or exclusion of Commonwealth's evidence).

including the Pa. State Police Drug Classes, the Top Gun Drug Class, Bucks, Montgomery and Delaware County D.A.'s class, DEA Schools, and Eastern States Vice Investigator's Associations Drug Trafficking Classes. He attended Undercover Narcotics School in New Jersey and has been a faculty member at Top Gun School. He has taught undercover operations at numerous D.A.'s offices and for the Pa. State Police Academy. He has testified as a drug expert in various counties throughout Pennsylvania and in Federal Court. At the suppression hearing, he was qualified as an expert in drugs and drug investigations.

3. In January of 2009, Trooper Skahill received information from a confidential informant ("CI–1") who told him that [Appellee] was involved in drug trafficking. CI–1 observed this throughout January of 2009. CI–1 observed that [Appellee] was secreting drugs, cocaine, in a car that was accessed by [Appellee]. CI–1 observed [Appellee] putting a large amount of cocaine inside that [Nissan] 350Z while it was parked almost right in front of 323 Rural Avenue. CI–1 observed this in the late evening hours/early morning hours of February 4–5, 2009. CI–1 estimated that at least one-half of a kilogram of cocaine was put inside the 350Z.

4. CI–1 observed transactions in which other individuals purchased cocaine from [Appellee]. CI–1 related that [Appellee] was operating a gold Mercedes Benz station wagon in and around the City of Chester, Pa. Also, he was utilizing a gray 350Z to stash and store his cocaine and also make sales and deliveries out of that vehicle. CI–1 related that he could find those vehicles in the area of the 300 block of Rural Avenue in Chester, Pa. CI–1 provided an accurate description of [Appellee]. Then, Trooper Skahill corroborated this information individually and also through other law enforcement sources, including Officer Dave Tyler of the Chester City Police Department. Trooper Skahill conducted a criminal history check of [Appellee] before applying for a search warrant. Trooper Skahill confirmed the identity of [Appellee].

5. Trooper Skahill had many successful prior contacts with CI–1, which led to the arrest of about eight individuals and seizures of large quantities of drugs, including cocaine. He had been working with him/her for approximately three years. CI–1 had given reliable information in the past that resulted in numerous arrests and convictions. CI–1 had always been truthful. CI–1 was making statements against his/her own interest. CI–1 demonstrated knowledge of narcotics, including preparing, packaging, weight, and prices.

6. As soon as Trooper Skahill got off the phone with CI–1 in the early morning hours of February 5, 2009, he headed straight down to 323 Rural Avenue. He contacted other officers in his unit and told them about the information he had received. Then, Trooper Skahill and members of the Pennsylvania State Police Troop K Vice Unit established an early morning surveillance of 323 Rural Avenue, Chester City, Pennsylvania. When Trooper Skahill arrived at approximately 7:30 a.m., he observed the 350Z parked across the street from 323 Rural Avenue and it was facing the wrong direction. At 10:30 a.m., he observed [Appellee] pull into the driveway leading into 323 Rural Avenue while operating a gold four-door Mercedes Benz station wagon. Then, he used keys to enter the residence at 323 Rural Avenue. From Trooper Skahill's vantage point, he could see the front door of the residence. [Appellee] came out of the

residence two times to meet with an individual in a pick-up truck and also to meet a female. At approximately 11:15 a.m., Trooper Skahill observed two marked Chester City Police vehicles arrive and enter the residence, after being greeted by [Appellee]. Ultimately, he learned that the City Police arrived based upon a report of a burglary at that residence.

7. The next witness to testify at the Suppression Hearing was Pennsylvania State Police Troop K Vice Narcotics Unit Officer Scott Miscannon. Trooper Miscannon was working undercover and established surveillance at about 9:00 a.m. on February 5, 2009 in front of 323 Rural Avenue in Chester, Pa. He observed [Appellee] exit a gold Mercedes Benz. He also observed a gray Nissan 350Z parked across the street from 323 Rural Avenue. Just prior to 1:20 p.m. he observed [Appellee] exit the residence, walk across the street to the passenger side of the Nissan and then [walk] directly back into 323 Rural Avenue. Then, [Appellee] peeked out of the residence but did not exit. Then, at approximately 1:20 p.m., the Trooper observed [Appellee] exit 323 Rural Avenue, walk across the street with a set of keys in his hand and enter the driver's side of the Nissan 350Z. He sat in the car for about one minute and then exited the car and headed back to 323 Rural Avenue. Officer Miscannon exited his vehicle, drew his duty weapon, and identified himself as a Pennsylvania State Police Officer, he was wearing a raid vest marked "State Police." [Appellee] fled but the Officer tackled him on the sidewalk next to the Nissan 350Z. He patted down [Appellee] and found a scale with suspected cocaine residue on it, a pill bottle with suspected marijuana, as well as keys to the Nissan and the Mercedes Benz.

8. Officer Miscannon testified that when he tackled [Appellee] he had observed no illegal conduct. The Officer was instructed to detain [Appellee] for merely entering and exiting the Nissan. He also testified he did not observe anything illegal in the Nissan prior to [Appellee] entering and exiting it.

9. Both vehicles were then transported to the Pa. State Police Station in Media, Pa. pending the application of search warrants. The Troopers believed the two vehicles contained cocaine and/or other evidence of [Appellee's] cocaine trafficking operation, and they applied for and received search warrants for the vehicles. The search of the Mercedes yielded $15,905.00 in cash. The search of the Nissan yielded: 5 clear plastic bags of cocaine, 3 additional bags of a white-powdery substance, and a bottle of Inositol powder. At the Pa. State Police Station in Media, Pa. Corporal Heins provided [Appellee] his *Miranda*[2] rights and then [Appellee] signed a three page written statement in which he admitted operating both vehicles. He admitted that there was approximately ½ of a kilogram of cocaine inside the Nissan 350Z. He stated he purchased the cocaine from a man named "Hector" from Northeast Philadelphia. He also said he owed Hector $19,500.00 for the cocaine inside the Nissan.

10. At the suppression hearing, Chester Police Officer David Tyler testified he is assigned full-time with the F.B.I. on the Drug Task Force. In February of 2009, Officer Tyler received information from a confidential informant ("CI–2") who told him that [Appellee] was supplying cocaine throughout the City of

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Chester to several mid-level cocaine dealers in Chester. CI–2 learned this information through [Appellee's] customers, the mid-level dealers. [Appellee] was getting approximately one-half of a kilo to a full kilo of cocaine on a weekly basis. Officer Tyler had many successful prior contacts with CI–2, which led to the arrest of more than ten individuals and seizures of large quantities of drugs, including cocaine. He had been working with him/her for approximately ten years. CI–2 had been a cocaine supplier in the past and demonstrated knowledge of narcotics. Officer Tyler relayed this information to Trooper Skahill prior to February 5, 2009. 11. Also at the hearing, [Appellee] called Mr. Gregory A. Bost, the fiancé of [Appellee's] sister. Mr. Bost testified that he owned the Mercedes and Nissan in question and that he allowed [Appellee] to operate both vehicles. He also testified that [Appellee] had access to the keys to both vehicles.

(Findings of Fact and Conclusions of Law, filed April 22, 2010, at 1–5) (internal citations to the record, footnotes, and quotation marks omitted).

On June 4, 2009, the Commonwealth filed criminal informations, charging Appellee with multiple counts of possession of a controlled substance, possession of a controlled substance with intent to deliver, possession of drug paraphernalia, and conspiracy.[3] On July 15, 2009, Appellee filed a motion to suppress all evidence obtained as a result of his arrest and the subsequent vehicle searches. The court conducted two hearings on the matter in February 2010. On April 22, 2010, the court granted Appellee's suppression motion. Specifically, the court determined the police did not possess reasonable suspicion or probable cause to support the seizure of

Appellee. The court concluded the illegal seizure warranted the suppression of all evidence recovered from Appellee's person and the vehicles, as well as Appellee's post-arrest statements.

On May 14, 2010, the Commonwealth filed a petition for reconsideration of the suppression motion. The Commonwealth argued the police had acted with probable cause, because two independent informants had supplied identical information about Appellee's drug dealing activities. Upon consideration of the Commonwealth's petition, the court vacated the suppression order on May 19, 2010. On June 11, 2010, the court heard argument on the reconsideration petition. On June 22, 2010, the court denied the reconsideration petition and reinstated the prior suppression order.

The Commonwealth timely filed a notice of appeal on July 15, 2010. The court did not order the Commonwealth to file a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b).

The Commonwealth raises two issues for our review:

DID THE TRIAL COURT ERR IN CONCLUDING TROOPERS LACKED REASONABLE SUSPICION TO DETAIN AND PROBABLE CAUSE TO ARREST [APPELLEE] WHERE TWO KNOWN AND RELIABLE CONFIDENTIAL INFORMANTS INDEPENDENTLY PROVIDED DETAILED INFORMATION THAT [APPELLEE] WAS SELLING COCAINE, TROOPERS CORROBORATED THE INFORMATION THROUGH SURVEILLANCE AND OTHER INVESTIGATION, ONE OF THE INFORMANTS OBSERVED [APPELLEE] PLACE A HALF KILO OF COCAINE IN A CAR WITHIN THE LAST FEW

---

**3.** 35 P.S. § 780–113(a)(16), (30), (32); 18 Pa. C.S.A. § 903.

HOURS, [APPELLEE] CHECKED ON THE CAR AFTER A REPORT OF A BURGLARY, [APPELLEE] ENTERED THE CAR USING KEYS AND [APPELLEE] FLED WHEN THE TROOPERS APPROACHED HIM AS HE GOT OUT OF THE CAR? DID THE TRIAL COURT ERR IN SUPPRESSING EVIDENCE SEIZED FROM THE VEHICLES FOLLOWING THE EXECUTION OF SEARCH WARRANTS WHERE THE APPLICATIONS FOR THE WARRANT PROVIDE SUFFICIENT PROBABLE CAUSE EVEN WITHOUT THE INFORMATION OBTAINED FOLLOWING [APPELLEE'S] ARREST?

(Commonwealth's Brief at 1).

When the Commonwealth appeals from a suppression order, the relevant scope and standard of review are:

[We] consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. As long as there is some evidence to support them, we are bound by the suppression court's findings of fact. Most importantly, we are not at liberty to reject a finding of fact which is based on credibility.

*Commonwealth v. Lehman,* 857 A.2d 686, 687 (Pa.Super.2004), *appeal dismissed as improvidently granted,* 584 Pa. 605, 886 A.2d 1137 (2005) (internal citations omitted). "The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts." *Commonwealth v. Keller,* 823 A.2d 1004, 1008 (Pa.Super.2003), *appeal denied,* 574 Pa. 765, 832 A.2d 435 (2003) (quoting *Commonwealth v. Nester,* 551 Pa. 157, 160, 709 A.2d 879, 881 (1998)).

In its first issue, the Commonwealth contends two known and reliable confidential informants provided police with detailed information regarding Appellee's use of a Mercedes and a Nissan to conduct cocaine-trafficking activities in the city of Chester. The Commonwealth asserts police corroborated the informants' tips through surveillance and investigation. Specifically, the Commonwealth avers that one of the informants reported Appellee had stashed half of a kilogram of cocaine inside the Nissan, and Trooper Miscannon subsequently observed Appellee checking on the car following reports of a nearby burglary. Under the totality of these circumstances, the Commonwealth argues Trooper Miscannon possessed reasonable suspicion to detain Appellee, as well as probable cause to justify a warrantless arrest of Appellee for possession of cocaine. The Commonwealth concludes it legally obtained the evidence from Appellee's person and the vehicles, and this Court must reverse the suppression court's order. We agree.

Contacts between the police and citizenry fall within three general classifications:

The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Bryant,* 866 A.2d 1143, 1146 (Pa.Super.2005), *appeal denied,* 583 Pa. 668, 876 A.2d 392 (2005).

■ Police must have reasonable suspicion that a person seized is engaged in unlawful activity before subjecting that person to an investigative detention. *Commonwealth v. Cottman,* 764 A.2d 595 (Pa.Super.2000).

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Jones,* 874 A.2d 108, 116 (Pa.Super.2005) (internal citations and quotation marks omitted).

■■ "The key difference between an investigative and a custodial detention is that the latter 'involves such coercive conditions as to constitute the functional equivalent of an arrest.'" *Commonwealth v. Gonzalez,* 979 A.2d 879, 887 (Pa.Super.2009) (quoting *Commonwealth v. Pakacki,* 587 Pa. 511, 519, 901 A.2d 983, 987 (2006)).

The court considers the totality of the circumstances to determine if an encounter is investigatory or custodial, but the following factors are specifically considered: the basis for the detention; the duration; the location; whether the suspect was transported against his will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions.

*Commonwealth v. Teeter,* 961 A.2d 890, 899 (Pa.Super.2008).

■ An arrest or "custodial detention" must be supported by probable cause:

Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a [person] of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require **only a probability,** and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Commonwealth v. Williams,* 2 A.3d 611 (Pa.Super.2010) (*en banc*), *appeal denied,* —— Pa. ——, 19 A.3d 1051 (2011) (internal citations and quotation marks omitted) (emphasis in original).

■ "[I]nformation received from confidential informants may properly form the basis of a probable cause determination." *Commonwealth v. Luv,* 557 Pa. 570, 576, 735 A.2d 87, 90 (1999). "Where ... the officers' actions resulted from information gleaned from an informant, in determining whether there was probable cause, the informant's veracity, reliability and basis of knowledge must be assessed." *In Interest of O.A.,* 552 Pa. 666, 676, 717 A.2d 490, 495 (1998). "An informant's tip may constitute probable cause where police independently corroborate the tip, or where the informant has provided accurate information of criminal activity in the past, or where the informant himself participated in the criminal activity." *Luv, supra* at 576, 735 A.2d at 90.

[W]hen two independent informants both supply the same information about a particular crime to the police, each

source tends inherently to bolster the reliability of the other. Although the information supplied by one questionable source may be insufficient, the probability is extremely small that a second independent source would supply identical information if it were not probably accurate. Such corroboration by independent sources produces the necessary reliability to establish probable cause. *Commonwealth v. Dukeman*, 917 A.2d 338, 342 (Pa.Super.2007), *appeal denied*, 594 Pa. 685, 934 A.2d 72 (2007) (quoting *Commonwealth v. Singleton*, 412 Pa.Super. 550, 603 A.2d 1072, 1074–75 (1992)).

█ Instantly, Trooper Skahill began working with CI–1 in 2006. Since that time, CI–1 had provided law enforcement with information leading to multiple convictions and the seizure of several kilograms of cocaine. Trooper Skahill indicated CI–1 "has a strong familiarity" with the preparation, packaging, and weighing of drugs for sale on the street. (*See* N.T. Suppression Hearing, 2/18/10, at 16.) CI–1 knows many individuals involved in drug trafficking, and CI–1 has made statements against his/her own penal interests to Trooper Skahill.

In January 2009, CI–1 informed Trooper Skahill that Appellee was involved in drug trafficking in the city of Chester. CI–1 knew individuals who had obtained cocaine from Appellee, and CI–1 had observed some of these transactions. Further, CI–1 had seen Appellee secreting cocaine inside a gray Nissan 350Z. Appellee utilized the Nissan to make cocaine sales and deliveries. CI–1 related that Appellee usually parked the Nissan near 323 Rural Avenue. CI–1 indicated Appellee also operated a gold Mercedes Benz station wagon, which Appellee regularly parked near 323 Rural Avenue.

Officer Tyler testified that he had received similar information about Appellee's drug trafficking activities from CI–2. Officer Tyler testified that he had worked with CI–2 for over ten years. During that ten-year period, CI–2 provided law enforcement with information leading to the issuance of search warrants, the seizure of large amounts cocaine, and more than ten (10) arrests. CI–2 routinely identified cocaine traffickers and their "stash locations," in addition to providing information about the packaging and prices for cocaine. (*See* N.T. Suppression Hearing, 2/26/10, at 52.)

Prior to February 5, 2009, CI–2 told Officer Tyler that Appellee "was supplying cocaine throughout the City of Chester to several mid-level cocaine dealers in Chester." (*Id.* at 53). CI–2 acquired this information by speaking with Appellee's customers, who were actually former customers of CI–2. CI–2 discovered that Appellee "was getting between a half a kilo to a full kilo on a weekly basis, of cocaine." (*Id.* at 54). CI–2 obtained this information "[f]rom purchasing several ounces of cocaine and through conversation with [Appellee]." (*Id.*) CI–2 also informed Officer Tyler that Appellee operated a silver Nissan and a gold Mercedes station wagon in the area of 323 Rural Avenue. Officer Tyler subsequently conducted "a roaming surveillance and observed both vehicles parked in front of 323 Rural Avenue...." (*Id.* at 55).

During the early morning hours of February 5, 2009, CI–1 called Trooper Skahill to inform him that he/she "had personally seen [Appellee] putting a large amount of cocaine inside that [Nissan] 350Z." (*See* N.T. Suppression Hearing, 2/18/10, at 38.) CI–1 made this observation a few hours before contacting the trooper, and CI–1 indicated the Nissan was parked "on the street on Rural Avenue, almost right in front of 323." (*Id.*) In light of this information, Trooper Skahill contacted mem-

bers of his unit to organize a surveillance operation. At 7:30 a.m., Trooper Skahill arrived on the 300 block of Rural Avenue. Trooper Skahill immediately identified the Nissan parked across the street from 323 Rural Avenue. At 10:30 a.m., Trooper Skahill observed Appellee drive the Mercedes Benz into the driveway of 323 Rural Avenue, exit the vehicle, and enter the property. At 11:15 a.m., Trooper Skahill saw Chester City police officers arrive at the property. Trooper Skahill later learned that these officers had responded to a reported burglary at the residence.

Trooper Miscannon, another member of the surveillance team, testified that the Chester City police officers departed the residence at 12:00 p.m. Appellee subsequently emerged from the residence and stood near the door "just kind of . . . looking out." (*Id.* at 92). At 1:20 p.m., Trooper Miscannon observed Appellee exit the residence, walk across the street, approach the passenger's side of the Nissan, and then return to the residence. Shortly thereafter, Appellee exited the residence with a set of keys in his hands. Appellee walked up to the driver's side of the Nissan, entered the vehicle, sat in the driver's seat for about a minute, exited, and started to walk back to 323 Rural Avenue. At that point, Trooper Miscannon exited his vehicle, identified himself, and drew his duty weapon. Appellee attempted to flee, and Trooper Miscannon tackled him to the sidewalk.

Even if Trooper Miscannon effectuated a custodial detention when he detained Appellee, the facts and circumstances known to the trooper at that time would warrant a person of reasonable caution to believe that Appellee had committed or was committing a crime. *See Williams, supra.* Specifically, the police had received detailed information about Appellee's drug activities from CI–1 **and** CI–2. Both informants had proven reliable in the past, and both informants had participated in criminal activity with Appellee. *See Luv, supra.* Further, CI–1 and CI–2 implicated Appellee in cocaine trafficking within the city of Chester, and both informants described with particularity Appellee's vehicles and where Appellee would park the vehicles. Thus, the information from each independent source inherently bolstered the other source, thereby producing the requisite reliability to establish probable cause. *See Dukeman, supra.*

Moreover, Officer Tyler conducted a surveillance operation and observed the Mercedes and the Nissan parked near 323 Rural Avenue. A few days later, after receiving new information from CI–1, Trooper Skahill also observed the Nissan parked across the street from 323 Rural Avenue. That same day, Trooper Skahill witnessed Appellee park the Mercedes in the driveway at 323 Rural Avenue, and Trooper Miscannon observed Appellee enter the Nissan following reports of a burglary in the vicinity.

Here, the troopers' surveillance independently corroborated much of the information from CI–1 and CI–2. *See Luv, supra.* Under the totality of these circumstances, Trooper Miscannon had probable cause to conduct a custodial detention after Appellee demonstrated his connection to the Nissan. *See Williams, supra.* Based upon the foregoing, we conclude the court erred in granting Appellee's suppression motion.[4] Accordingly, we reverse and remand for further proceedings.

---

4. In its second issue, the Commonwealth argues the affidavit for the search warrant demonstrated probable cause to search the vehicles even without the information obtained from Appellee's arrest. We note the suppression court did not provide any findings of fact or conclusions of law in relation to the adequacy of the affidavit for the search warrant.

Order reversed; case remanded for further proceedings. Jurisdiction is relinquished.

Rather, the court concluded that all evidence should be suppressed as fruit of the poisonous tree, because "Officer Miscannon possessed neither probable cause to arrest nor reasonable suspicion to conduct an investigatory detention." (See Findings of Fact and Conclusions of Law at 7.) In light of our resolution of the Commonwealth's first issue, we do not address the second issue.