**Commonwealth v. Carrillo-Quintero**

C.P. of Lehigh County, No 5366 of 2012

*Craig W. Scheetz*, for Commonwealth.
*Maureen Coggins, Peter C. Bowers, Charles A. Banta* and *David D. Ritter*, for defendants.

FORD, *J.*, December 10, 2013—Defendants, Fanis Melo-Degonzalez (Melo-Degonzalez), Alfredo Junior Vargas (Vargas), Joel Carrillo-Quintero (Carrillo-Quintero) and Joel Estrada-Anguiano (Estrada-Anguiano) were charged with drug-related offenses following their arrest on October 7, 2012. On that day, troopers of the Pennsylvania State Police stopped a vehicle in which defendants were traveling and seized illegal drugs found in the vehicle.

The four defendants have filed omnibus pretrial motions under Pa.R.Crim.P. 578. In these motions, defendants seek suppression of all evidence obtained following their arrests. In seeking suppression, the defendants argue that the troopers lacked reasonable suspicion or probable cause to detain them and to subsequently search the car in

which they were traveling. The defendants have also filed *habeas corpus* petitions in which they contend that the Commonwealth has not produced *prima facie* evidence to support the drug charges filed against them. Finally, defendant Melo-Degonzalez has filed a motion under Pa.R.Crim.P. 583 requesting that her trial be severed from that of the other three defendants.

Hearings on defendants' motions were conducted on September 4, 2013, and October 10, 2013. For the reasons that follow, the defendants' suppression motions lack merit and must be denied. Additionally, because the Commonwealth met its burden of presenting *prima facie* evidence to support the drug charges against the defendants, the *habeas corpus* petitions must likewise be denied. Finally, because defendant Melo-Degonzalez failed to meet her burden of demonstrating that severance of her case from that of the other defendants is necessary to avoid her experiencing unfair prejudice, that motion must be denied.

## Findings of Fact

On the morning of October 7, 2012, Trooper Jonathan Gerken of the Pennsylvania State Police was on patrol operating a marked police vehicle on westbound Interstate 78 in Lehigh County, Pennsylvania. Riding with Trooper Gerken was Trooper James Ford. Both troopers were wearing uniforms.

At 4:54 a.m., Trooper Gerken clocked a gray Nissan Altima with an Illinois license plate traveling at 72 miles per hour in an area with posted speed limit signs of 55 miles per hour. Trooper Gerken activated the lights and sirens on his marked police vehicle to stop the Altima. The driver of the Altima immediately pulled the vehicle to the

right-hand shoulder of westbound 78 at mile marker 50, near the exit for State Route 100.

Trooper Gerken approached the driver-side window of the Altima. Inside the Altima, Estrada-Anguiano was sitting in the driver's seat; Melo-Degonzalez was in the front passenger seat; Vargas was in the right rear passenger seat, and Carrillo-Quintero was in the left rear passenger seat. Trooper Gerken asked Estrada-Anguiano to produce his driver's license and registration for the Altima. In response, Estrada-Anguiano produced an international driver's license, but he did not possess an accompanying passport. Trooper Gerken believed the license was invalid without the passport. Estrada-Anguiano also gave the trooper a Thrifty Car Rental (Thrifty) agreement for the Altima. Under this rental agreement, Melo-Degonzalez, not Estrada-Anguiano, was the authorized driver of the vehicle. Trooper Gerken asked all occupants of the Altima to produce some form of identification. Melo-Degonzalez produced a valid Ohio driver's license; Vargas showed a permanent resident card; and Carrillo-Quintero had a Mexican citizen identification card.

Trooper Gerken noticed an automobile air filter on the back seat console of the Altima. The trooper found this to be suspicious since the Altima was a rental vehicle. Additionally, Trooper Gerken noticed that the three male passengers, especially Estrada-Anguiano, were acting very nervously. The trooper saw a pulsation in a large vein in Estrada-Anguiano's neck.

Trooper Gerken read in the rental agreement that the Altima should have been returned to Thrifty five days earlier. Therefore, Trooper Ford placed a telephone call to Thrifty. A Thrifty representative informed the trooper

that the rental agreement had been extended and that the Altima was due to be returned to Thrifty in Cincinnati, Ohio, later that day.

Trooper Gerken observed that the rental agreement authorized a third-party rental of the Altima, whereby the person who arranged for the rental was not the authorized driver of it. Trooper Gerken, through his experience as a state trooper, understood that to be a not uncommon arrangement for persons wishing to conceal their identities while they traffic in illegal drugs.

In asking questions of Estrada-Anguiano and Carrillo-Quintero, Trooper Gerken realized that the two men had a limited understanding of english, but he still was able to have some conversation with them. Through this questioning, the trooper concluded there was an inconsistency in the statements of the two men about the type of employment Estrada-Anguiano had. There was an insufficient basis for this conclusion due to the significant inability of these men to speak English. Trooper Gerken asked Estrada-Anguiano for his home address so he could prepare a written warning for speeding. Estrada-Anguiano told the trooper that he did not know the zip code for his home address in Bakersfield, California. The trooper allowed Estrada-Anguiano to call his wife to get this information.

At approximately 5:40 a.m., Trooper Gerken telephoned Trooper Chad Labour of the Pennsylvania State Police K-9 unit who was then at home a considerable distance from the scene. Gerken requested that Labour come to the scene with his K-9 "Dano" to conduct a drug search of the Altima. Trooper Labour with Dano arrived at the scene at approximately 6:30 a.m.

After Trooper Labour arrived, Trooper Gerken approached Estrada-Anguiano who was standing at the rear of the Altima. The trooper presented Estrada-Anguiano with a written warning for speeding and returned the four identifications provided by the occupants of the car. Trooper Gerken told Estrada-Anguiano that he was free to leave, but only if the Altima were driven by Melo-Degonzalez, the authorized driver under the rental agreement. Estrada-Anguiano began to walk to the front of the Altima, but then Trooper Gerken asked Estrada-Anguiano to return for additional questions. Estrada-Anguiano complied. Trooper Gerken asked Estrada-Anguiano if he had any drugs or large sums of cash in the Altima. Estrada-Anguiano answered in the negative, but he turned and looked at the trunk of the Altima. With this, Trooper Gerken asked for consent to search the Altima. Estrada-Anguiano answered that he would have to ask Melo-Degonzalez for permission to search. Melo-Degonzalez refused to give permission to search. Trooper Gerken then ordered the other three occupants out of the car and told them to stand on the side of the highway. They remained by the highway without handcuffs.

Once the suspects exited the vehicle, Trooper Gerken asked Trooper Labour to check the vehicle with Dano. Because there was no consent to search, Trooper Labour planned to restrict the search to the outside of the Altima. He began with a safety check which included reaching into the Altima to ensure that the vehicle was in "park" and not running. Trooper Labour then had Dano perform a fast-paced sweep around the Altima. This initial sweep did not result in Dano's indicating the presence of illegal drugs. Next, Trooper Labour had Dano do a more detailed search. Dano exhibited an "alert" near the front driver-

side wheelwell. An "alert" happens when the K-9 detects the scent of illegal drugs, but it cannot pinpoint an exact point of origin. As Dano moved along the side of the Altima, he unexpectedly jumped through the front driver-side window which had been left open. Trooper Labour did not expect this behavior. Within a matter of seconds, Dano provided an "indication" that illegal drugs were located in the lower console area below the gearshift. An "indication" occurs when the K-9 detects the scent of illegal drugs and precisely locates the point of origin for that scent. Trooper Labour removed Dano from the vehicle after this "indication."

At approximately 6:50 a.m., based on the above information, Trooper Gerken arrested the four defendants by placing them in handcuffs. The defendants were transported to the Fogelsville State Police Barracks. All defendants were interviewed by Gerken at the barracks. Prior to interviewing each defendant, Gerken read each person the *Miranda* rights. Trooper Angel Cruz, who is fluent in Spanish, assisted by translating the *Miranda* rights for each defendant. The four defendants waived their *Miranda* rights by indicating that they understood their rights and that they were willing to be interviewed. Each person made a statement to Trooper Gerken.

After Trooper Gerken obtained a warrant to search the Altima, he, Trooper Labour and Trooper James Hafner conducted a search of it at approximately 9:45 a.m.. The search revealed eight bundles of heroin with a total weight of 2902.5 grams (six pounds and six ounces). One bundle of heroin was located hidden in duct tape in the air filter compartment under the hood of the Altima. Other bundles were found secreted in duct tape in the trunk. The estimated street value of the heroin is $600,000.

Conclusions of Law

Suppression

The defendants contend that Trooper Gerken lacked reasonable suspicion or probable cause to detain them after an admittedly legitimate traffic stop and to subsequently search the Altima. For the reasons that follow, this contention lacks merit.

A defendant seeking suppression of evidence against him bears the preliminary burden of establishing that he has standing to challenge the admissibility of the evidence and a reasonable or legitimate expectation of privacy in the area searched. *Commonwealth v. Maldonado*, 14 A.3d 907, 910 (Pa. Super. 2011) (citation omitted). The Commonwealth concedes that all defendants have standing to challenge the search of the vehicle due to their being charged with possessory offenses. However, the Commonwealth asserts that the defendants did not have a reasonable expectation of privacy in the vehicle and its contents. While co-defendant Melo-Degonzalez met her burden of demonstrating a legitimate expectation of privacy in the Altima, the other three defendants made no such showing.

"An expectation of privacy is present when the individual, by his conduct, exhibits an actual (subjective) expectation of privacy and that subjective expectation is one that society is prepared to recognize as reasonable." *Commonwealth v. Burton*, 973 A.2d 428, 435 (Pa. Super. 2009) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 118 (Pa. Super. 2005)). A defendant's subjective expectation is not the determinant in evaluating the legitimacy of an expectation of privacy; rather, the inquiry focuses on the reasonableness of any expectation under the surrounding

circumstances. *Id.*

Pennsylvania courts have held that, in order to demonstrate an expectation of privacy in a vehicle, a defendant must show a possessory interest in it. *Commonwealth v. Arthur*, 62 A.3d 424, 430 (Pa. Super. 2013). A defendant, at a minimum, must show that he owns the vehicle searched or that he was operating the vehicle with the permission of the owner. *Id.* at 429-30. Moreover, a defendant "has no legitimate expectation of privacy in a vehicle owned by a third party and solely used by a co-conspirator." *Id.* at 430 (citation omitted). Under this rationale, the Superior Court has held that a defendant has no privacy interest in the trunk of a vehicle in which he is a passenger where the vehicle is registered to a third person. *Commonwealth v. Powell*, 994 A.2d 1096, 1107 (Pa. Super. 2010).

Here, the evidence shows that the Altima was owned by Thrifty and that co-defendant Melo-Degonzalez was an authorized driver of that vehicle under a third party rental agreement. Thus, Melo-Degonzalez had a legitimate possessory interest in the vehicle. She could reasonably expect that items she placed in the vehicle would remain private.

Without evidence of the relationship between Melo-Degonzalez and the other defendants, the court must conclude that these other three were passengers only with no privacy interest in what was under the hood and in the trunk of the vehicle. These three defendants did not own the Altima and there was no evidence that they had permission from Thrifty to operate the vehicle. Thus, none of these three defendants met the burden of demonstrating a reasonable expectation of privacy in the

vehicle. Because defendants Vargas, Carrillo-Quintero and Estrada-Anguiano failed to meet their burden of showing a reasonable expectation of privacy in the Altima, their suppression motions must be denied.

With recognition that defendant Melo-Degonzalez has standing to seek suppression of the illegal drugs found in the Altima, I now address whether Trooper Gerken possessed the requisite level of proof to detain her and then search the vehicle.

Interactions among citizens and police officers require different levels of justification depending upon the nature of the interactions and whether or not the citizens are detained. *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa. Super.2000). Contacts between the police and citizenry fall within three general classifications:

> The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Goldsborough*, 31 A.3d 299,305 (Pa. Super. 2011) (quoting *Commonwealth v. Bryant*, 866 A.2d 1143, 1146 (Pa. Super. 2005)).

> Reasonable suspicion [supporting an investigative detention] exists only where the officer is able to articulate specific observations which, in conjunction

with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Goldsborough*, 31 A.3d at 306 (quoting *Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005)). Reasonable suspicion is determined objectively under the totality of the circumstances. *Commonwealth v. Stevenson*, 894 A.2d 759, 771 (Pa. Super. 2006) (citation omitted).

If there is a legitimate investigative detention, how long may it last?

[W]hile "the brevity of the invasion of an individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion", "its cases imposed no rigid time limits on *Terry* stops." Thus, ...[a] key factor to be examined in determining if a detention lasts too long to be justified as an investigative stop, is whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."

*Commonwealth v. Ellis*, 541 Pa. 285, 296, 662 A.2d 1043, 1048 (1995) (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568 1575 (1985)).

"Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Commonwealth v. Dommel*, 885 A.2d 998, 1002 (Pa. Super. 2005)(quoting *In re C.C.J.*, 799 A.2d 116, 121 (Pa. Super. 2002)).

After the legitimate speeding stop by Trooper Gerken, his observations of the car and its occupants gave him reasonable suspicion that criminal activity, namely, transportation of drugs, was afoot. The trooper's suspicion arose when he discovered that the defendants were operating the vehicle with a third-party rental agreement; a car part, the air filter, meant for under the hood was in the middle of the backseat of the rented Altima; the driver was unable to state his complete home address; and the driver showed signs of unusual nervousness.

With this reasonable suspicion of criminal activity, Trooper Gerken was authorized in calling Trooper Labour at approximately 5:40 a.m., about 46 minutes after the initial stop, to have Labour conduct a drug search with his K-9. *See Commonwealth v. Martin*, 626 A.2d 556, 559-60 (Pa. Super. 1993) (holding that a K-9 sniff of the exterior of an automobile is a search that must be supported by reasonable suspicion).

After the initial stop of the Altima until the K-9 drug search, the police diligently pursued a course to confirm or dispel the suspicion of crime. The troopers verified the four out-of-state identifications, checked out the rental car agreement and ascertained the full home address for Estrada-Anguiano. They did all of this on the side of an

interstate highway before dawn while keeping proper observation of four unknown adults. Throughout this time, the defendants were as comfortable as the troopers. No one was cuffed. This was a proper investigative detention supported by reasonable suspicion.

The K-9's indicating the presence of drugs, combined with Trooper Gerken's earlier observations, gave him probable cause to believe that defendants were transporting drugs. Only when the police reached this point did they arrest the defendants and place handcuffs on them. Trooper Gerken then obtained a search warrant; the car was searched; and the police found a large quantity of heroin. For a factually similar case in which the Supreme Court of Pennsylvania found that police had reasonable suspicion (and eventually probable cause) to suspect drug activity, *see Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185 (2004).

The police acted in accord with the law in detaining and then arresting defendants. They acted in accord with the law in seizing the heroin. The Commonwealth may use the seized heroin in the trial of the defendants. The arrest of the defendants and the seizure of the drugs did not create an initial illegality which would taint any evidence which followed, such as statements.

*Habeas Corpus*

In deciding a *habeas corpus* issue, the court must determine whether the Commonwealth has established a *prima facie* case against an accused of the crimes with which he is charged. *Commonwealth v. Packard*, 767 A.2d 1068, 1070 (Pa. Super. 2001). A *prima facie* case exists when the Commonwealth produces evidence of each of the crime's material elements sufficient to establish probable

cause warranting a belief that the accused committed the crime. *Commonwealth v. Weigle*, 997 A.2d 306, 311 (Pa. 2010) (citation omitted). "The evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury." *Id.* (citation omitted).

Each defendant is charged with possession of a controlled substance, possession with intent to deliver a controlled substance and conspiracy to deliver a controlled substance. The finder-of-fact may infer a defendant's intent to deliver from the facts and circumstances of the case considered as a whole. *Commonwealth v. Ratsamy*, 934 A.2d 1233, 1237 (Pa. 2007); *Commonwealth v. Kirkland*, 831 A.2d 607, 611 (Pa. Super. 2003). "Relevant factors in establishing intent [to deliver] include the quantity of drugs possessed, the manner of packaging, the absence of paraphernalia for drug use, the behavior of the defendant, the presence of large amounts of cash, and expert opinion testimony." *Commonwealth v. Heater*, 899 A.2d 1126, 1131 (Pa. Super. 2006) (citations omitted).

In this case, the drugs were hidden in the Altima in which the defendants were traveling. There were no drugs found on the individuals. When drugs are not located on a defendant's person, the Commonwealth must prove constructive possession. *Commonwealth v. Gray*, 469 A.2d 169, 171 (Pa. Super. 1983). Constructive possession requires a demonstration that the accused has the "power to control the contraband and the intent to exercise that power." *Commonwealth v. Jones*, 378 A.2d 914, 915 (Pa. Super. 1977). A defendant's mere presence in a group of individuals, all of whom had equal access to contraband, is not alone sufficient to establish constructive possession but it is relevant on the issue of possession. *Commonwealth v.*

*Juliano*, 490 A.2d 891, 893-94 (Pa. Super. 1985) (citations omitted). "Location of the contraband in an area usually accessible only to the defendant may lead to an inference that he placed it there or knew of his presence if others did so." *Id.* at 894 (citations omitted).

The heroin was concealed in various areas of the car in which all defendants were occupants. A bundle of heroin was hidden in the air filter compartment under the hood of the Altima. The actual air filter of the vehicle was inside the passenger compartment of the vehicle on the back seat console. This removed air filter was right between two of the defendants and it was within reach of all four as they admittedly traveled a long distance in the car. The heroin under the hood was secured with duct tape as was the heroin in the trunk. This is circumstantial evidence that all defendants were aware of the drugs hidden in the air filter compartment and in the trunk due to the use of duct tape and that they constructively possessed the drugs. It was explained in the expert testimony of Trooper Matthew Tretter of the Pennsylvania State Police that the amount of heroin contained in the Altima had an estimated street value of up to $600,000. No drug use paraphernalia was found in the vehicle. These circumstances suggest that defendants possessed the drugs with the intent to deliver them to third parties. Such a quantity of drugs, tied sufficiently to each defendant as it was here, does not need to be accompanied by expert testimony for a lay person to reasonably conclude that it was held for delivery purposes. For all of these reasons, the Commonwealth has met its burden of producing *prima facie* evidence to support the drug charges against all defendants.

Severance

Severance motions are governed by Pa.R.Crim.P. 583, which reads: "[t]he court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Furthermore,

> [w]hen conspiracy is charged, a joint trial generally is advisable. In ruling upon a severance request, the trial court should consider the likelihood of antagonistic defenses. A claim of mere hostility between defendants, or that one defendant may try to exonerate himself at the expense of the other, however, is an insufficient basis upon which to grant a motion to sever. Indeed, this court has noted that "'the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together.'" (Citations omitted). Instead, severance should be granted only where the defenses are so antagonistic that they are irreconcilable-i.e., the jury essentially would be forced to disbelieve the testimony on behalf of one defendant in order to believe the defense of his co-defendant.

*Commonwealth v. Brown*, 592 Pa. 376, 401, 925 A.2d 147, 161-62 (2007) (internal citations omitted).

Because the Commonwealth charges that a conspiracy to deliver illegal drugs existed among the four defendants, a joint trial is proper where no evidence was presented that a joint trial would be prejudicial to Melo-Degonzalez. While the possibility exists that defendants will attempt to exonerate themselves at the expense of one another at trial, this factor alone does not constitute grounds for severance. Also, there was no showing by Melo-Degonzalez that her

possible defenses will be so antagonistic to the others that the jury would be forced to disbelieve the testimony of one defendant in order to believe the testimony of another. For these reasons, the severance motion must be denied.