J-A16031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| TONY HELL | : | |
| | : | |
| Appellant | : | No. 1533 EDA 2024 |

Appeal from the Judgment of Sentence Entered May 10, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003155-2023

BEFORE: LAZARUS, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED SEPTEMBER 10, 2025**

Appellant, Tony Hell, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his bench trial convictions for persons not to possess firearms, carrying a firearm without a license, and carrying firearms on public streets in Philadelphia.[1] We affirm.

The relevant facts and procedural history of this appeal are as follows. On April 13, 2023, Philadelphia Police Officer Dante Givens and his partner, Officer Sowell, were on patrol in West Philadelphia. Around noon, the officers received a call over police radio. The call indicated that there were "four males at 46th and Market [Streets], wearing all black clothing, two with black face

_____

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

masks on, [one] with a blue face mask, armed with firearms."[2] (N.T. Suppression Hearing, 8/18/23, at 20-21). Regarding the 4600 block of Market Street, Officer Givens explained: "Due to the fact that it's a subway stop for the el, we get a lot of robbery calls; and sometimes a few shooting calls at that location." (*Id.* at 20).

The officers responded to the scene and immediately observed four individuals matching the description of the suspects. One of these individuals was Appellant. Officer Givens, who was driving the patrol car, stopped the car to allow Officer Sowell to exit. Officer Sowell "began walking behind the males." (*Id.* at 22). Officer Givens proceeded to park the patrol car a little further up the block. Officer Givens exited to take up a position in front of the suspects. Officer Givens observed that Appellant kept "his hand in his jacket, like in a stiff position, covering his front area[.]" (*Id.*) The officer asked

_____

[2] The police radio call stemmed from information provided to a 911 dispatcher by an unidentified caller. The caller "just observed … a group of teens … and then another group of teens, mad, they had a stare-off[.]" (Suppression Hearing Exhibit D-1 at 0:22-0:32). The caller observed "it don't look good." (*Id.* at 0:44-0:46). Although Officer Givens testified that the police radio call described the suspects as armed, the caller did not expressly inform the 911 dispatcher about the presence of a firearm. Rather, the following exchange occurred between the caller and the dispatcher:

> [DISPATCHER:]     Alright. Did you see any weapons?
>
> [CALLER:]     It looked like they had a bulge. They keep huddling up and doing something in their waist. But if you could just check them out.

(*Id.* at 1:10-1:20).

Appellant, "Do you have something in your front area?" (*Id.*)  At that point, all four suspects fled.  Additional officers responded to the scene, and the pursuit lasted "about a minute." (*Id.* at 23).  Ultimately, Officer Douglas Miller apprehended Appellant and recovered a loaded firearm from his front waistband.  (*See id.* at 82).

On May 12, 2023, the Commonwealth filed a criminal information charging Appellant with multiple violations of the Uniform Firearms Act ("VUFA").  Appellant filed an omnibus pretrial motion on May 25, 2023.  Among other things, Appellant requested the suppression of all evidence obtained as a result of his interaction with the police.  Specifically, Appellant claimed that the police conducted an illegal arrest without probable cause, and he was subjected to a "stop and frisk" on less than reasonable suspicion.  In addition to the omnibus pretrial motion, Appellant filed a motion to bar consideration of "high-crime area" as a factor in deciding the suppression issue.  Appellant insisted that "[a] high-crime area designation must be considered legally irrelevant because it only establishes that other people have committed crimes in the past in that area, not that the particular defendant has engaged in illegal activity."  (Motion, filed 7/31/23, at 2).

The court conducted Appellant's suppression hearing on August 18, 2023.  The hearing commenced with counsel providing argument on the motion to bar consideration of whether the stop occurred in a high-crime area.  After the court denied this motion, it received testimony from Officers Givens

and Miller.[3]   The Commonwealth also presented body camera footage from the officers at the scene, and Appellant presented a recording of the 911 call that prompted the incident.   At the conclusion of the hearing, the court provided an on-the-record statement with its findings of fact.   Nevertheless, the court did not immediately issue its conclusions of law.   The court noted: "My hold up is whether unprovoked flight is enough, and if the officers' testimony is enough to show that this is what's called a high-crime area." (N.T. Suppression Hearing at 125).   Thus, the court continued the matter to provide the parties with additional time to present relevant case law on the matter.   By order entered October 2, 2023, the court denied Appellant's suppression motion.

Appellant proceeded to a stipulated bench trial on March 7, 2024.   At the conclusion of the trial, the court found Appellant guilty of all three counts of VUFA.   On May 10, 2024, the court sentenced Appellant to an aggregate term of eleven and one-half (11½) to twenty-three (23) months' imprisonment, followed by three (3) years of probation.   The court also granted immediate parole to house arrest.   Appellant timely filed a notice of appeal on May 30, 2024.   On June 28, 2024, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

_____

[3] Significantly, Officer Miller echoed the assessment of Officer Givens regarding the 4600 block of Market Street: "It's a SEPTA stop.  There's a lot of foot traffic, and we see a lot of robberies, shooting, thefts, that kind of thing."  (N.T. Suppression Hearing at 78).

Appellant subsequently complied.

Appellant now raises two issues for this Court's review:

Did the police lack reasonable suspicion to justify a seizure under Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution, where the anonymous tip did not in fact allege that someone matching [Appellant's] description brandished a firearm, possessed a firearm, or otherwise engaged in criminal activity, and where police did not observe [Appellant] engage in criminal or sufficiently suspicious activity?

Even if [Appellant] was not seized until he ran and police chased him, did the police still lack reasonable suspicion to justify a seizure under Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution, where:

a. the evidence presented at the suppression hearing failed to establish that the location where police chased [Appellant] was a high crime area, and

b. even if the Commonwealth presented sufficient evidence to demonstrate the area was "high crime," using that fact to support reasonable suspicion violated Article 1, Section 8?

(Appellant's Brief at 2-3).

Appellant's issues are related, and we address them together. Initially, Appellant contends that four (4) uniformed police officers in two (2) separate vehicles arrived at the location where Appellant and his confederates were walking. Appellant asserts that the officers followed the suspects, with Officer Givens questioning Appellant about whether he was concealing something on his person. Appellant maintains that he attempted to terminate the encounter by walking away, but one of the officers cut him off. Under these

circumstances, Appellant posits that he "was necessarily seized no later than when Officer Givens asked him whether he had 'something in [his] front area.'" (*Id.* at 20) (quoting N.T. Suppression Hearing at 22). Appellant also suggests that the police lacked reasonable suspicion to conduct a seizure at this point, because the information provided by the anonymous 911 caller contained no allegations of criminal behavior.

Appellant acknowledges the suppression court's conclusions that: "1) he was not seized until after he began running; and 2) his flight occurred in a high-crime area." (*Id.* at 27). Appellant insists, however, that "the Commonwealth failed to adequately establish that the location where [Appellant's] flight occurred was [a] high-crime area." (*Id.*) Appellant complains that the testimony from Officers Givens and Miller did not say "enough about crime in the location where they encountered [Appellant] to permit the trial court to properly conclude … that [the location] was nonetheless deserving of the designation." (*Id.* at 29-30). Moreover, Appellant argues that "[a]n otherwise unlawful stop cannot be constitutionally justified merely because it occurred in a high-crime area." (*Id.* at 32). For these reasons, Appellant concludes that this Court must reverse the order denying his suppression motion and order a new trial. We disagree.

The following principles inform this Court's review of a suppression ruling:

> An appellate court's standard of review in addressing a
> challenge to the denial of a suppression motion is limited to

determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa.Super. 2017), *appeal denied*, 647 Pa. 522, 190 A.3d 580 (2018).

Contacts between the police and citizenry fall within three general classifications:

The first level of interaction is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Rice*, 304 A.3d 1255, 1260 (Pa.Super. 2023) (quoting *Commonwealth v. Goldsborough*, 31 A.3d 299, 305 (Pa.Super. 2011)).

"During a mere encounter, as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no

intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.* (internal citation and quotation marks omitted). An "investigative detention" is interchangeably labeled as a "stop and frisk" or a "*Terry* stop."[4] *Commonwealth v. Brame*, 239 A.3d 1119 (Pa.Super. 2020), *appeal denied*, 666 Pa. 240, 251 A.3d 771 (2021).

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.
>
> \* \* \*
>
> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.

*Rice, supra* at 1261 (quoting *Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa.Super. 2005)).

"The question of whether reasonable suspicion existed at the time of an

_____

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." ***Commonwealth v. Thomas***, 273 A.3d 1190, 1197 (Pa.Super. 2022), *appeal denied*, \_\_\_ Pa. \_\_\_, 283 A.3d 793 (2022) (quoting ***Commonwealth v. Cottman***, 764 A.2d 595, 598-99 (Pa.Super. 2000)).

> These circumstances are to be viewed through the eyes of a trained officer.
>
> In making this determination, we must give due weight … to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct.  Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Id.*** (internal citations and quotation marks omitted).

Recently, this Court reiterated that reasonable suspicion exists where a police officer observes a defendant's unprovoked flight in a high-crime area:

> In [***Commonwealth v.***] ***Jefferson***[, 853 A.2d 404 (Pa.Super. 2004)], this Court addressed whether the observation of the appellant in a high crime area and his flight from police combine to establish the familiar ***Terry*** standard of reasonable suspicion.  We recognized that [in] ***Illinois v. Wardlow***, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000),
>
>> the United States Supreme Court held that although mere presence in a high crime area is insufficient to support a ***Terry*** stop, the additional factor of unprovoked flight was indeed relevant.  The Court ultimately concluded that the two factors in combination were sufficient to satisfy the ***Terry***

standard of reasonable suspicion.

We further observed that the Pennsylvania Constitution affords no additional protections:

Following *Wardlow*, it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment….

While additional facts may negate reasonable suspicion, *Wardlow* requires no additional facts to establish reasonable suspicion.

*Commonwealth v. Barnes*, 296 A.3d 52, 57-58 (Pa.Super. 2023) (internal quotation marks and some citations omitted).

Instantly, the suppression court analyzed several cases, including *Wardlow*, before concluding that Appellant's "unprovoked flight in a high-crime area was sufficient to create reasonable suspicion for the officers' pursuit."[5] (Suppression Court Opinion, filed 10/2/24, at 5). Our review of the record confirms this conclusion. Officer Givens's testimony established that a call went out over police radio regarding four suspects, possibly armed, in the vicinity of 46th and Market Streets. Contrary to Appellant's assertions, the

_____

[5] Notwithstanding its conclusion, the suppression court "urges the Superior Court to reconsider the current law surrounding the definition and importance of high-crime areas[.]" (Suppression Court Opinion at 5-6). We reiterate, however, that "as an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court." *Commonwealth v. Fuentes*, 272 A.3d 511, 521 (Pa.Super. 2022) (quoting *Bell v. Willis*, 80 A.3d 476, 479 (Pa.Super. 2013)). "It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court." *Id.* (quoting *Bell, supra* at 479).

police witnesses at the suppression hearing provided adequate testimony to establish that this was a high-crime area due to the presence of the subway station. **See Wardlow, supra** at 124, 120 S.Ct. at 676, 145 L.Ed.2d at \_\_\_ (providing that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"). Further, Officers Givens and Sowell responded to the scene and encountered the suspects, who promptly fled. These facts alone created reasonable suspicion to justify a **Terry** stop. **See Barnes, supra**.

Regarding Appellant's argument that the police effectuated a seizure when Officer Givens asked Appellant a question, our review of Officer Sowell's body camera footage undermines this assertion. The footage commences inside the officers' patrol car while they drove to the suspects' location. (**See** Suppression Hearing Exhibit C-2 at 0:01-0:55). After passing the subway station, the patrol car stopped, and Officer Sowell exited. (**Id.** at 0:55-0:57). Officer Sowell moved between parked cars to enter the sidewalk. (**Id.** at 0:57-1:03). At the same time, the suspects appeared walking down the sidewalk.

Officer Sowell asked the question, "You all good?" (**Id.** at 0:59-1:00). Officer Sowell added, "You got an issue going on or anything like that just now?" (**Id.** at 1:01-1:05). Three of the four suspects turned their heads to look at Officer Sowell, briefly stopped, responded to the officer's question, and resumed walking in a nonchalant manner. (**Id.** at 1:02-1:10). The fourth

suspect, who was a few feet in front of his cohorts, never broke stride. (***Id.***) As the suspects advanced down the sidewalk, they saw the officers' patrol car, which Officer Givens had parked near the next intersection. (***Id.*** at 1:16).

The suspect who walked a few feet in front of his cohorts then started to run down 46th Street. (***Id.*** at 1:17). Officer Givens appeared from behind the patrol car to give chase.[6] (***Id.*** at 1:18). At that point, the remaining three suspects scattered, fleeing in different directions. (***Id.*** at 1:19-1:20). As Officer Sowell followed one of the suspects onto Market Street, a patrol car with back-up officers became visible. (***Id.*** at 1:20).

Here, the body camera footage revealed that the suspects believed that they were free to walk away from Officer Sowell, even though the officer exited his vehicle to ask a few innocuous questions. Regarding the subsequent appearance of Officer Givens and the patrol car, we note the officers did not position themselves in a manner that hindered the suspects' liberty to continue advancing down the sidewalk, and the officers did not tell the suspects that they were not free to leave. Absent more, the suspects' interaction with the officers remained a mere encounter prior to their unprovoked flight. ***See Rice, supra***. Based upon the foregoing, the court

---

[6] From the footage taken by Officer Sowell's body camera, any question asked by Officer Givens was inaudible. Although the record also included Officer Givens's body camera footage, this recording commenced after the suspects had already fled. (***See*** Suppression Hearing Exhibit C-3).

did not commit legal error in denying Appellant's suppression motion.[7]  **See**

**Ford, supra**.  Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/10/2025

_____

[7] Considering Appellant's conviction for carrying firearms on public streets in Philadelphia, we must acknowledge this Court's recent decision in **Commonwealth v. Sumpter**, 2025 PA Super 124 (filed June 23, 2025), which deemed this statute unconstitutional on an equal protection basis as applied to the appellant in that case.  **Sumpter**, however, analyzed the constitutionality of Section 6108 insofar as the statute prohibits the unlicensed **open** carry of firearms on public streets and public property in the city of Philadelphia.  Here, the record makes clear that Appellant's firearm was concealed on his person at the time of his arrest.  (**See** Criminal Complaint, dated 4/14/23, at 1).  Moreover, Appellant's brief makes no argument regarding the constitutionality of the statute at issue.  **See Commonwealth v. Spone**, 305 A.3d 602, 609 (Pa.Super. 2023) (reiterating that issues of constitutional dimension cannot be raised for first time on appeal).  Based upon the foregoing, **Sumpter** affords no relief for Appellant.